IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUN, YUCHEN JUSTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. |
| v. | ) | |
| | ) | |
| BLOOMBERG, L.P., and BLOOMBERG, INC., | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Yuchen Justin Sun, by and through the undersigned counsel, brings this action for public disclosure of private facts and promissory estoppel against Defendants Bloomberg, L.P. and Bloomberg, Inc., and alleges as follows:

## INTRODUCTION

1.    Plaintiff Yuchen Justin Sun ("Plaintiff") brings this action to prevent Defendants Bloomberg, L.P. and Bloomberg, Inc. (collectively "Bloomberg" or "Defendants") from recklessly and improperly disclosing his highly confidential, sensitive, private, and proprietary financial information.  Plaintiff will suffer significant and irreparable harm—both financially and physically—if this sensitive financial information is published by Bloomberg.

2.    Plaintiff is a successful entrepreneur in the blockchain and cryptocurrency industry. Most notably, Plaintiff is the founder of TRON, a blockchain platform that has evolved into one of the most active open blockchain platforms in the world with over 300 million accounts.  Given his successful business ventures and holdings, Plaintiff has accumulated a sizable portfolio of various cryptocurrencies and other valuable assets.

3.      Earlier this year, Plaintiff was approached by Bloomberg asking whether he would like to be included in Bloomberg's online "Billionaires Index," which is a ranked list of the world's richest people. Bloomberg told Plaintiff that before he could be included in the Billionaires Index, Bloomberg would need to verify his assets to confirm his net worth.

4.      Prior to agreeing to participate, Plaintiff received explicit assurances from Bloomberg that his highly sensitive, confidential, and proprietary financial information, particularly related to his cryptocurrency holdings, would be held "strictly confidential" and was provided to Bloomberg for the sole purpose of verifying his total net worth. Based on Bloomberg's express promises of confidentiality, as well as a review of other Bloomberg billionaire profiles that  include cryptocurrency holdings, which report only a lump sum value of cryptocurrency holdings, Plaintiff agreed to participate in the Billionaires Index and provide Bloomberg with his sensitive financial information.

5.      Despite its express promise of confidentiality, Bloomberg intends to publish Plaintiff's specific financial holdings—in granular detail—alongside misstatements about Plaintiff's holdings. This disclosure would cause significant harm to Plaintiff, including but not limited to, an invasion of privacy, as well as subject Plaintiff to a significant risk of theft, hacking, kidnapping, and bodily harm to him and his family.

## PARTIES

6.      Plaintiff is an individual who resides in Hong Kong.

7.      Bloomberg, L.P. is a limited partnership existing under the laws of the state of Delaware with its principal place of business at 731 Lexington Ave, New York, NY 10022.

8.      Bloomberg, Inc. is a corporation incorporated in the state of Delaware with its principal place of business at 731 Lexington Ave, New York, NY 10022. Bloomberg Inc. is the parent company of Bloomberg, L.P.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2).

10.     This Court has personal jurisdiction over Bloomberg, L.P., a limited partnership existing under the laws of the state of Delaware.

11.     This Court has personal jurisdiction over Bloomberg, Inc., a limited partnership existing under the laws of the state of Delaware.

12.     Venue is appropriate under 28 U.S.C. § 1391(b). On information and belief, Defendants reside in this district.

## FACTUAL BACKGROUND

**A.      Bloomberg Agreed To Maintain the Confidentiality of Plaintiff's Confidential Financial Information.**

13.     On or around February 4, 2025, a member of Plaintiff's team was approached by Muyao Shen, a journalist with Bloomberg, through WeChat.  Ms. Shen wanted to schedule an interview with Plaintiff.

14.     However, due to other media commitments, Plaintiff's availability to participate in an interview with Bloomberg at that time was limited.  On February 11, 2025, during a call on WeChat, Plaintiff's team informed Ms. Shen that Plaintiff needed to defer any interview because of other media commitments.  Ms. Shen subsequently suggested that Bloomberg could feature Plaintiff on the Bloomberg Billionaires Index.

3

15.    Bloomberg maintains an online "Billionaires Index," inviting its audience to "[v]iew profiles for each of the world's 500 richest people, see the biggest moves, and compare fortunes or track returns."[1]

16.    Plaintiff was told that in order to be featured in the Billionaires Index, he would need to provide Bloomberg with his financial information regarding the value of specific assets and details related to his ownership of those assets that are highly confidential, sensitive, private, and proprietary information ("Confidential Financial Information").

17.    While initially interested in being featured in the Billionaires Index, Plaintiff had reservations due to the sensitivity of his substantial cryptocurrency holdings.  Plaintiff was particularly concerned about the confidentiality and security of his Confidential Financial Information, and the potential risks to his personal safety and business interests if Bloomberg were to disclose those details publicly.

18.    In February 2025, Plaintiff had multiple conversations with Ms. Shen.  During those conversations, Plaintiff communicated his significant confidentiality and data security concerns. Ms. Shen told Plaintiff that any information Plaintiff provided to Bloomberg for the purpose of verifying his personal wealth would be kept strictly confidential and would only be used to verify his personal assets for the Billionaires Index profile.

19.    Based on Ms. Shen's representations, Plaintiff was led to believe that the only information that would be reported about his assets in the Billionaires Index profile was the total value of his cryptocurrency holdings, and the general asset types and sources of his wealth. Plaintiff understood, based on Ms. Shen's assurances, that his cryptocurrency holdings would be reported as a single lump sum amount and identified generally as "cryptocurrency" holdings.

---

[1] https://www.bloomberg.com/billionaires/ (last visited August 7, 2025).

4

20.     Before deciding whether to participate in the Billionaires Index, and to verify Ms. Shen's representations, Plaintiff carefully reviewed other profiles on the Billionaires Index to see the extent of personal financial details published by Bloomberg, particularly as it related to cryptocurrency holdings.  Based on Plaintiff's review, he determined that the Billionaires Index did not generally disclose specific cryptocurrency holdings beyond bitcoin, and any reporting on bitcoin holdings is based solely on public statements made by the individuals themselves or public disclosures.[2]  Any reporting of cryptocurrency holdings other than bitcoin is either based on public statements or not quantified.  Plaintiff also learned that the Billionaires Index relies overwhelmingly on public filings, statements, and its own disclosed calculations and does not publish confidential or privately shared information.

21.     Plaintiff would not have agreed to participate in Bloomberg's Billionaires Index if he had known that Bloomberg would publish granular details about his cryptocurrency assets, including a breakdown of his cryptocurrency holdings.

22.     Even after Plaintiff agreed to be profiled in the Billionaires Index, Plaintiff and his team continued to be assured by Bloomberg that it would not use information from Plaintiff's Confidential Financial Information for any other purpose, including publication, and would ensure that all of Plaintiff's Confidential Financial Information would be securely maintained to prevent disclosure. Indeed, Bloomberg provided assurances to Plaintiff and emphasized that no one, aside from select Bloomberg employees, would be able to access it.

---

[2] *See e.g.*, https://www.bloomberg.com/billionaires/profiles/brian-armstrong/ (last visited August 10, 2025); https://www.bloomberg.com/billionaires/profiles/cameron-h-winklevoss/ (last visited August 10, 2025); https://www.bloomberg.com/billionaires/profiles/changpeng-zhao/ (last visited August 10, 2025); https://www.bloomberg.com/billionaires/profiles/michael-j-saylor/ (last visited August 10, 2025).

23.     On or around February 27, 2025, Sprina Wang, the Senior Director of Marketing and Operations in support of TRON DAO created a group chat on Telegram, a secure messaging platform, between herself, Yeweon Park, Timothy Chung, and Mr. Sloan (the "Telegram Chat"). Ms. Park is a Public Relations Lead for TRON and Plaintiff's publicist. Mr. Chung is a technology staff member for TRON and was the point of contact for Bloomberg in the wealth verification process. Mr. Sloan is a Bloomberg journalist and was introduced to Plaintiff and his team as a member of Bloomberg's wealth verification team. Plaintiff was added to the Telegram Chat on February 28, 2025, and another Bloomberg journalist, Tom Maloney, was added to the Telegram Chat later on March 19, 2025.

24.     On or around February 28, 2025, Mr. Sloan provided the Telegram Chat with his email address so Mr. Chung could share Plaintiff's Confidential Financial Information required for verification. To again stress the sensitivity of the Confidential Financial Information, when sending the documents, Mr. Chung stated "[w]e also hope that only trust & limited people have access right for the documents, which can maximize the protection of our data." Mr. Sloan replied, "Yes, definitely."

25.     On March 3, 2025, Mr. Sloan reiterated the security measures in place to protect the privacy of Plaintiff's Confidential Financial Information:

> Also--just wanted to double check that our plan for analyzing Justin's historical transactions is OK. Arkham Intelligence built a custom API for Bloomberg which allows us to compile data on token transfers and conversions to fiat for the wallet addresses you provided. That API is located on our internal network, meaning the file of Justin's wallet addresses **won't leave our office and the only people who have access are my team and the engineers who manage the API** (Arkham won't have access). Are you all OK with that plan as it relates to data security? (emphasis added).

26.     On March 8, 2025, Plaintiff confirmed in the Telegram Chat that Bloomberg's additional security measures were acceptable.

27.   To continue to stress the sensitivity of the Confidential Financial Information, on March 27, 2025, Plaintiff's team once again referred to the parties' prior agreement regarding the limited use of, and the protection of, Plaintiff's Confidential Financial Information in the following messages sent in the Telegram Chat:

> **All information shared within the group is strictly confidential and for verification purposes only.** Once the verification is complete, the data must be deleted. The data is solely for verification and may not be used for any other purpose (including reporting). We will not provide any responses beyond the verification service, as that falls entirely outside the scope of simply providing data.
>
> **This asset data is extremely sensitive. The spreadsheet is for verification purposes only and must not be used for any other purpose**. Any leakage may result in legal liability, and the data must be deleted. We will not answer any questions regarding these assets. We only provide data to verify authenticity.
>
> Bloomberg must also agree to use the data strictly in accordance with our requirements — for example, to provide only a general assessment or overall valuation based on the data, without making any specific references or detailed reporting on the figures. **This data is being provided solely for verification purposes and is not intended for reporting.** (emphasis added)

28.   Bloomberg did not object to Plaintiff's March 27, 2025, assertion of confidentiality or otherwise reject Plaintiff's understanding of the parties' agreement as to the use and protection of Plaintiff's Confidential Financial Information.  This further confirmed the representations of Ms. Shen and Plaintiff's understanding of what information was currently published in other profiles in the Bloomberg's Billionaires Index.

29.   Bloomberg was made aware, repeatedly, that Plaintiff valued the privacy of the details of his Confidential Financial Information.  Based on the numerous representations made by Bloomberg reporters, Plaintiff reasonably believed that Bloomberg understood Plaintiff's privacy

concerns and would only use his Confidential Financial Information for the sole purpose of verifying his personal wealth.

30.     Without Bloomberg's confidentiality assurances, Plaintiff would not have agreed to participate in Bloomberg's Billionaires Index.

**B.      Despite its Promises of Confidentiality, Bloomberg Intends to Publish Incorrect Information and Sensitive Details of Plaintiff's Confidential Financial Information.**

31.     On or around July 29, 2025, Plaintiff's team learned that Ms. Shen was using figures from Plaintiff's Confidential Financial Information in an unrelated Bloomberg article.

32.     In the Telegram Chat, Ms. Wang reminded Mr. Sloan and Mr. Maloney that Bloomberg agreed to honor the confidentiality of the wealth verification process and safeguard Plaintiff's Confidential Financial Information.  Wang further stated that Ms. Shen's use of the Confidential Financial Information was in clear violation of Bloomberg's promise of confidentiality.

33.     In late July 2025, Bloomberg sent Plaintiff's team a draft Billionaire Index profile for Plaintiff that Bloomberg intended to publish.  Not only did the draft Billionaire Index profile contain numerous inaccuracies about Plaintiff's personal history and his wealth, but it also contained a detailed breakdown of Plaintiff's Confidential Financial Information, including the specific amounts of cryptocurrencies owned by Plaintiff ("Cryptocurrency Breakdown").

34.     The information Bloomberg intended to publish in Plaintiff's Billionaire Index profile was far more detailed than the type of information Bloomberg publishes as part of the Bloomberg Billionaires Index.  Moreover, the inclusion of the Cryptocurrency Breakdown was contrary to Bloomberg's representations, upon which Plaintiff relied  when he agreed to provide his Confidential Financial Information to Bloomberg.

8

35.    On or around August 2, 2025, counsel for Plaintiff sent Bloomberg a cease-and-desist letter, demanding Bloomberg immediately cease and desist from any use, disclosure, or publication of any information—verbal or written—regarding Plaintiff's financial holdings other than the total net worth and the asset type and classification.  In this letter, Plaintiff's counsel detailed the significant harm that Plaintiff would suffer if Bloomberg were to publish his Confidential Financial Information, including his Cryptocurrency Breakdown.

36.    After numerous discussions with Bloomberg's Global Newsroom Counsel, Bloomberg confirmed its intent to publish the Cryptocurrency Breakdown.  While no timeline was given, Plaintiff's counsel was informed that publication would occur "imminently."

**C.    Plaintiff Will Be Imminently And Irreparably Harmed By The Publication Of His Confidential Financial Information.**

37.    The disclosure of Plaintiff's Confidential Financial Information without his consent, and specifically publication of the Cryptocurrency Breakdown, would not only constitute a substantial invasion of Plaintiff's privacy but will subject Plaintiff (and his family) to a significant and imminent risk of theft, hacking, kidnapping, and bodily harm.

38.    A well-established industry exists for tracking cryptocurrency transfers, aimed at identifying the owners of wallets holding large amounts of digital assets—commonly referred to as "Whales."  In fact, there are numerous websites that exist for this sole purpose.[3]

39.    Due to the open-source and transparent nature of most public blockchains—which allow anyone to view transaction histories, wallet addresses, and balances—it is both feasible and

---

[3]    *See    e.g.,*    Whale    Alert,    https://whale-alert.io/;    Crypto    Whale    Tracker, https://cryptocurrencyalerting.com/crypto-whale-tracker.html;    Unusual    Whales, https://unusualwhales.com/.

relatively straightforward to identify wallet addresses with distinctive characteristics, such as unusually large balances or unique compositions of cryptoassets.

40.    Thus, by disclosing the specific amounts of Plaintiff's cryptocurrency holdings broken out by cryptocurrency, Bloomberg will provide everyone—including bad actors—with vital information necessary to identify crypto wallets that are owned by Plaintiff.  Indeed, even if holdings are split among multiple wallets, bad actors can identify linked wallets through address clustering techniques, which analyze patterns such as common inputs, transaction flows, or behavioral signals, to find multiple addresses controlled by the same individual or entity.

41.    As soon as the Plaintiff's wallets are identified, associated wallets can also be found.

42.    Given his significant crypto holdings, once Plaintiff's wallet numbers are known, Plaintiff will become a considerable target for bad actors who can use the information to determine the methods to carry out an attack, which may include a variety of tools to steal, extort, and attack Plaintiff.

43.    For example, attackers can use advanced, tailored, and targeted social engineering and phishing to obtain the seedphrase (which functions similar to a password) which would allow them to steal the funds from Plaintiffs' wallets.  These bad actors might also impersonate a cryptoexchange or wallet provider.  It is well known in the industry that these bad actors can craft extremely convincing fake emails or direct messages ("spear phishing") using on-chain behavior as bait.

44.    Unlike traditional financial systems, crypto transactions are irreversible.  If Plaintiff is coerced, hacked, or scammed out of their funds, there is little or no recourse.  Moreover, crypto

is transferable without third-party oversight, making it an ideal medium for ransom demands.  As one Bloomberg article recognized:

> ***People with crypto wealth face unique physical risks*** because public blockchain networks like Bitcoin and Ethereum allow tokens to be transferred instantly and anonymously. This means that if an individual is coerced into giving up the access credentials to their holdings, their assets can vanish within seconds with little chance of recovery. Conversely in traditional financial services, bank accounts can be frozen or seized by law enforcement, allowing more chances to get back lost money.[4]

45.    There have been documented attacks of large cryptocurrency holders and their family members, including kidnapping, torture, and other physical violence ("wrench attacks"), to force the transfer of crypto funds.  Public wallet visibility increases the risk of such wrench attacks because it provides potential bad actors with additional information necessary to effectuate their attack, namely a characteristically distinctive amount of cryptocurrency tied to an otherwise anonymous wallet holder.

46.    Bloomberg itself has published articles detailing the significant threat of attacks on individuals known to own cryptocurrency.[5]

## COUNT I: PUBLIC DISCLOSURE OF PRIVATE FACTS

47.    Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

48.    The Cryptocurrency Breakdown is Plaintiff's private Confidential Financial Information that is not otherwise known to the public.

---

[4]https://www.bloomberg.com/news/articles/2025-05-18/crypto-high-rollers-go-big-on-bodyguards-to-deter-kidnappers (last accessed on August 10, 2025) (emph. added).

[5] *See e.g.*, https://www.bloomberg.com/opinion/articles/2025-05-22/crypto-crime-is-the-future-bank-heists-are-history (last accessed August 7, 2025); https://www.bloomberg.com/news/articles/2025-05-18/crypto-high-rollers-go-big-on-bodyguards-to-deter-kidnappers (last accessed August 10, 2025).

49.     Plaintiff's Confidential Financial Information, including the Cryptocurrency Breakdown, was provided to Bloomberg for the sole purpose of verifying Plaintiff's total wealth, and not for publication or other public disclosure.

50.     Publicizing Plaintiff's Cryptocurrency Breakdown is highly offensive to a reasonable person because it exposes Plaintiff to a significant and imminent risk of theft, hacking, kidnapping, and bodily harm.

51.     The specific amounts of cryptocurrency owned by Plaintiff are not of legitimate public concern.   Indeed, Bloomberg does not include the specific amounts and types of cryptocurrency asset holdings owned by other individuals unless in a prior public statement or disclosure—e.g., Brian Armstrong, Cameron Winklevoss, Changpeng Zhao, and Michael Saylor—on the same Bloomberg Billionaires Index.

52.     Bloomberg unequivocally stated its intention to publish Plaintiff's Cryptocurrency Breakdown on their platforms, exposing it to their millions of monthly readers, as well as bad actors who will use it to identify Plaintiff's wallets.

53.     Accordingly, Plaintiff seeks injunctive relief prohibiting Bloomberg from publishing the amounts of any specific cryptocurrency owned by Plaintiff.

**COUNT II: PROMISSORY ESTOPPEL**

54.     Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

55.     Representatives of Bloomberg promised Plaintiff that the amounts of cryptocurrency owned by Plaintiff would not be publicized and that they would take measures to protect Plaintiff's Confidential Financial Information from disclosure.

56.     Representatives of Bloomberg promised Plaintiff that any Confidential Financial Information provided by Plaintiff would only be used to verify Plaintiff's total wealth.

57.     Representatives of Bloomberg made these promises to Plaintiff with the purpose and expectation of persuading Plaintiff to provide his Confidential Financial Information.

58.     Plaintiff relied upon these promises when he made the decision to participate in the Billionaires Index and provide his Confidential Financial Information to Bloomberg.

59.     Without these promises, Plaintiff would not have agreed to participate in the Billionaires Index or provide Bloomberg with his Confidential Financial Information upon which Bloomberg used to develop the Cryptocurrency Breakdown.

60.     Plaintiff is at risk of harm if his Confidential Financial Information, including his Cryptocurrency breakdown, is published by Bloomberg.

61.     Injustice can only be avoided by enforcing the promises Bloomberg made to Plaintiff by enjoining Bloomberg from publishing the amounts of any specific cryptocurrency owned by Plaintiff.

**PRAYER FOR RELIEF**

Accordingly, Plaintiff respectfully requests that the Court enter judgment in his favor, granting it the following relief:

A.     A temporary restraining order prohibiting Bloomberg from publishing the amounts of any specific cryptocurrency owned by Plaintiff;

B.     A preliminary and permanent injunction prohibiting Bloomberg from publishing the amounts of any specific cryptocurrency owned by Plaintiff;

C.     Award Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Grant Plaintiff such further relief as Court deems just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.


Dated:  August 11, 2025                              BAKER & HOSTETLER LLP

                                                     /s/  *Jeffrey J. Lyons*
                                                     Jeffrey J. Lyons (#6437)
                                                     1201 N. Market Street, Suite 1407
                                                     Wilmington, DE 19801
                                                     (302) 407-4222
                                                     jjlyons@bakerlaw.com

                                                     *Attorney for Plaintiff Yuchen Justin Sun*