IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUN, YUCHEN JUSTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. |
| v. | ) | |
| | ) | |
| BLOOMBERG, L.P., and BLOOMBERG, INC., | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF MOTION
FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**


Dated: August 11, 2025

BAKER & HOSTETLER LLP
Jeffrey J. Lyons (#6437)
1201 N. Market Street, Suite 1407
Wilmington, DE 19801-1147
(302) 468-7088
jjlyons@bakerlaw.com

*Attorney for Plaintiff Yuchen Justin Sun*

## TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 1

    A.   Bloomberg Approached Plaintiff Regarding Inclusion in Billionaires Index. .................... 1

    B.   Bloomberg Agreed To Maintain the Confidentiality of Plaintiff's Confidential Financial Information. ...................................................................................................................... 2

    C.   Despite its Promises of Confidentiality, Bloomberg Intends to Publish Plaintiff's Confidential Financial Information ................................................................................... 5

    D.   Plaintiff Will Be Imminently And Irreparably Harmed By The Publication Of His Confidential Financial Information .................................................................................. 6

III.  LEGAL STANDARD ............................................................................................. 9

IV.   ARGUMENT .......................................................................................................... 10

    A.   Plaintiff is Likely to Succeed on the Merits of his Claims. ............................................. 10

    B.   Plaintiff Will Be Irreparably Harmed Absent an Injunction. ........................................... 13

    C.   Granting Relief Will Not Result in Greater Harm to the Nonmoving Party. .................... 14

    D.   An Injunction Will Serve the Public Interest. ................................................................. 16

V.    CONCLUSION ....................................................................................................... 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.A. v. New Jersey*,
  176 F. Supp. 2d 274 (D.N.J. 2001), *aff'd in part, remanded in part sub nom.*
  *A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206 (3d Cir. 2003)...............................................19

*Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*,
  456 F. App'x 184 (3d Cir. 2012) ......................................................................................6, 14

*Barlow v. Serv. Emps. Int'l Union Loc. 668*,
  90 F.4th 607 (3d Cir. 2024) .....................................................................................................20

*Baton v. Ledger SAS*,
  740 F. Supp. 3d 847 (N.D. Cal. 2024) ..............................................................................17, 18

*Cabela's LLC v. Highby*,
  362 F. Supp. 3d 208 (D. Del. 2019), *aff'd*, 801 F. App'x 48 (3d Cir. 2020) ..........................15

*CKSJB Holdings LLC v. EPAM Sys., Inc.*,
  837 F. App'x 901 (3d Cir. 2020) .............................................................................................15

*Cohen v. Cowles Media Co.*,
  501 U.S. 663 (1991)...........................................................................................................16, 20

*CrowdStrike, Inc. v. NSS Labs, Inc.*,
  No. CV 17-146-GMS, 2017 WL 588713 (D. Del. Feb. 13, 2017) ..........................................14

*Democratic Nat. Comm. v. Republican Nat. Comm.*,
  673 F.3d 192 (3d Cir. 2012)....................................................................................................20

*Does v. City of Trenton Dep't of Pub. Works*,
  565 F. Supp. 2d 560 (D.N.J. 2008) ........................................................................................20

*Duffy v. Lewis Bros. Bakeries, Inc.*,
  760 F. Supp. 3d 704 (S.D. Ind. 2024) ....................................................................................17

*Erie Telecommunications, Inc. v. City of Erie, Pa.*,
  853 F.2d 1084 (3d Cir. 1988)..................................................................................................20

*Fanean v. Rite Aid Corp. of Delaware*,
  984 A.2d 812 (Del. Super. Ct. 2009) ......................................................................................15

*Fischer v. Governor of New Jersey*,
   842 F. App'x 741 (3d Cir. 2021) ...................................................................20

*Florence v. Ord. Express, Inc.*,
   674 F. Supp. 3d 472 (N.D. Ill. 2023) ............................................................17

*GTE Sylvania Inc. v. Consumer Prod. Safety Comm'n*,
   404 F. Supp. 352 (D. Del. 1975) ....................................................................19

*Lord v. Peninsula United Methodist Homes, Inc.*,
   No. CIV.A. 97C-10-012, 2001 WL 392237 (Del. Super. Apr. 12, 2001) .............15

*Purdy v. Burlington N. & Santa Fe Ry.*
   Co., No. 0:98-CV-00833-DWF, 2000 WL 34251818 (D. Minn. Mar. 28,
   2000) .............................................................................................................17

*Purdy v. Burlington N. Santa Fe Corp.*,
   21 F. App'x 518 (8th Cir. 2001) .....................................................................17

*Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*,
   138 F. App'x 431 (3d Cir. 2005) ....................................................................20

*Securities & Exchange Commission v. Chappell*,
   107 F.4th 114 (3d Cir. 2024) .........................................................................19

*Spence v. Cherian*,
   135 A.3d 1282 (Del. Super. Ct. 2016) ............................................................16

*Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*,
   No. CV 14-1268-SLR, 2014 WL 5088690 (D. Del. Oct. 9, 2014) ......................14

*Wolfson v. Lewis*,
   924 F. Supp. 1413 (E.D. Pa. 1996) .................................................................20

*Zimmerman v. Int'l Longshoreman's Assoc. Local 1694*,
   No. 1:22-CV-01192-JCG, 2024 WL 3104957 (D. Del. June 24, 2024) (D. Del.
   June 24, 2024) ................................................................................................15

## I.     <u>**INTRODUCTION**</u>

Plaintiff Yuchen Justin Sun ("Plaintiff") filed this action on August 11, 2025, bringing claims for promissory estoppel and public disclosure of private facts, the same day of the filing of this Motion.   Plaintiff now files this Motion for Temporary Restraining Order to prevent Defendants Bloomberg, L.P. and Bloomberg, Inc. (collectively "Bloomberg" or "Defendants") from recklessly and improperly disclosing his highly confidential, sensitive, private, and proprietary financial information.   Plaintiff will suffer significant and irreparable harm—both financially and physically—if this sensitive financial information is published by Bloomberg. Regardless of Defendants' own promises to maintain the confidentiality of this information, Defendants now unequivocally state their intention to publish Plaintiff's private financial information on their platforms, exposing it to their millions of monthly readers.

Plaintiff is entitled to a temporary restraining order ("TRO") prohibiting Defendants from publishing the amounts of any specific cryptocurrency owned by Plaintiff because Plaintiff is likely to succeed on the merits of his public disclosure of private facts and promissory estoppel claims against Defendants; Defendants' planned disclosure of Plaintiff's private financial information will cause Plaintiff irreparable harm, including the threat of theft, hacking, kidnapping, and bodily injury; and, because the balance of the equities and public interest favor a preliminary injunction. *See Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 F. App'x 184, 188 (3d Cir. 2012).

## II.     <u>**STATEMENT OF FACTS**</u>

### A.     <u>**Bloomberg Approached Plaintiff About Inclusion in Billionaires Index.**</u>

Plaintiff is a successful entrepreneur in the blockchain and cryptocurrency industry. Compl., ¶ 2.  Most notably, Plaintiff is the founder of TRON, a blockchain platform that has evolved into one of the most active open blockchain platforms in the world with over 300 million

accounts. *Id.* Given his successful business ventures and holdings, Plaintiff has accumulated a sizable portfolio of various cryptocurrencies and other valuable assets. *Id.*

Bloomberg, L.P. maintains an online "Billionaires Index," inviting its audience to "[v]iew profiles for each of the world's 500 richest people, see the biggest moves, and compare fortunes or track returns."[1] On or around February 2025, Muyao Shen ("Ms. Shen"), a journalist from Bloomberg, L.P. contacted Plaintiff, expressing Bloomberg's interest in interviewing Plaintiff. Declaration of Sprina Wang ("Wang Decl."), ¶ 6. However, due to other media commitments, Plaintiff's availability to participate in an interview with Bloomberg at that time was limited. *Id.* On February 11, 2025, during a call on WeChat, Plaintiff's team informed Ms. Shen that Plaintiff needed to defer any interview because of other media commitments. *Id.*, ¶ 7. Ms. Shen subsequently suggested that Bloomberg could feature Plaintiff on the Bloomberg Billionaires Index. *Id.* Plaintiff was told that in order to be featured in the Billionaires Index, he would need to provide Bloomberg with his financial information regarding the value of specific assets and any details related to his ownership of those assets which are highly confidential, sensitive, private, and proprietary information ("Confidential Financial Information"). *Id.*, Exh. A.

**B.**    **Bloomberg Agreed To Maintain the Confidentiality of Plaintiff's Confidential Financial Information.**

In February 2025, prior to providing Bloomberg with his Confidential Financial Information, Plaintiff had multiple conversations with Ms. Shen. Declaration of Yuchen Justin Sun ("Sun Decl."), ¶ 6. During those conversations, Plaintiff communicated his significant confidentiality and data security concerns. *Id.* Ms. Shen told Plaintiff that any information Plaintiff provided to Bloomberg for the purpose of verifying his personal wealth would be kept

---

[1] https://www.bloomberg.com/billionaires/ (last visited August 7, 2025).

strictly confidential and would only be used to verify his personal assets for the Billionaires Index profile. *Id.*

Based on Ms. Shen's representations, Plaintiff clearly understood that the ***only information*** to be reported in Bloomberg's Billionaires Index was the total sum of Plaintiff's personal wealth with a ***general breakdown*** of the asset types and sources of Plaintiff's wealth. *Id.*, ¶ 7. To be clear, Plaintiff believed his investments in cryptocurrencies would be reported as one lump sum amount and would not be broken down by each crypto currency asset. *Id.* Plaintiff's understanding was consistent with Bloomberg's current practice related to cryptocurrency assets for other crypto billionaires in the Billionaires Index, which Plaintiff reviewed before deciding whether to participate in the Billionaires Index. *See id.*, ¶¶ 7-8. Based on Plaintiff's review, he determined that the Billionaires Index did not disclose specific cryptocurrency holdings beyond bitcoin, and any reporting on bitcoin holdings is based solely on public statements made by the individuals themselves or public disclosures. *Id.*, ¶ 8. Plaintiff also learned that the Billionaires Index relies overwhelmingly on public filings, statements, and its own disclosed calculations and does not publish confidential or privately shared information. *Id.* In reliance on Bloomberg's assurances, as well as its current reporting practices, Plaintiff agreed to provide his Confidential Financial Information to Bloomberg. Plaintiff would not have agreed to participate in Bloomberg's Billionaires Index if he had known that Bloomberg would publish granular details about his cryptocurrency assets, including a breakdown of his cryptocurrency holdings. *Id.*, ¶ 9.

Throughout the verification process, Bloomberg repeatedly affirmed its confidentiality commitments to Plaintiff. On or around February 28, 2025, in a group chat on Telegram, a messaging platform, that included Bloomberg journalists, Plaintiff, and Plaintiff's team (the "Telegram Chat"), one of the Bloomberg journalists, Mr. Sloan, provided his email address so

Plaintiff could share the Confidential Financial Information required for verification. Wang Decl., Exh. B, 1. To again stress the sensitivity of the Confidential Financial Information, Timothy Chung, a technology staff member at TRON and the point of contact for Bloomberg in the wealth verification process, stated "[w]e also hope that only trust & limited people have access right for the documents, which can maximize the protection of our data." *Id.* Mr. Sloan replied, "Yes, definitely." *Id.*

To further put Plaintiff and Plaintiff's team at ease, Mr. Sloan followed up with the group on March 4, 2025, reiterating Bloomberg's confidentiality parameters:

> Also--just wanted to double check that our plan for analyzing Justin's historical transactions is OK. Arkham Intelligence built a custom API for Bloomberg which allows us to compile data on token transfers and conversions to fiat for the wallet addresses you provided. That API is located on our internal network, meaning the file of Justin's wallet addresses **won't leave our office and the only people who have access are my team and the engineers who manage the API** (Arkham won't have access). Are you all OK with that plan as it relates to data security?

*Id.* at 2 (emphasis added). On March 8, 2025, Plaintiff confirmed in the Telegram Chat that Bloomberg's additional security measures were acceptable.

On March 25, 2025, as the verification process continued, Plaintiff continued to stress the sensitivity of his Confidential Financial Information, and reiterated the parties' prior agreement regarding the limited use of, and the protection of, his information in the Telegram Chat:

> **All information shared within the group is strictly confidential and for verification purposes only.** Once the verification is complete, the data must be deleted. The data is solely for verification and may not be used for any other purpose (including reporting). We will not provide any responses beyond the verification service, as that falls entirely outside the scope of simply providing data.
>
> **This asset data is extremely sensitive. The spreadsheet is for verification purposes only and must not be used for any other purpose**. Any leakage may result in legal liability, and the data must be deleted. We will not answer

any questions regarding these assets. We only provide data to verify authenticity.

Bloomberg must also agree to use the data strictly in accordance with our requirements — for example, to provide only a general assessment or overall valuation based on the data, without making any specific references or detailed reporting on the figures. **This data is being provided solely for verification purposes and is not intended for reporting.**

*Id.* at 3. Bloomberg did not object to Plaintiff's assertion of confidentiality or otherwise reject Plaintiff's understanding of the parties' agreement as to the use and protection of Plaintiff's Confidential Financial Information. *Id.*

### C.  Despite its Promises of Confidentiality, Bloomberg Intends to Publish Plaintiff's Confidential Financial Information.

On or around July 29, 2025, Plaintiff's team learned that Ms. Shen was using figures from the Confidential Financial Information in an unrelated Bloomberg article. Wang Decl., Exh. B, 4. It also became clear that Bloomberg planned to publish a detailed breakdown of Plaintiff's financial assets in the Billionaires Index, including the specific amounts of cryptocurrencies owned by Plaintiff ("Cryptocurrency Breakdown"). *Id.*, ¶ 18. The information Bloomberg intended to publish in the profile story was far more detailed than the type of information usually published as part of the Bloomberg Billionaires Index and was contrary to Ms. Shen's representations made during her voice calls with Plaintiff, upon which Plaintiff relied when he agreed to provide his Confidential Financial Information to Bloomberg. Sun Decl., ¶ 13. These revelations stunned Plaintiff and his team, given Bloomberg's repeated assurances of confidentiality.

In the Telegram Chat, Ms. Wang reminded Mr. Sloan and Mr. Maloney that Bloomberg agreed to honor the confidentiality of the wealth verification process and safeguard Plaintiff's private personal data. Wang Decl., Exh. B, 4. Ms. Wang also informed Mr. Maloney that the information Bloomberg intended publish was inaccurate. *Id.*, 6. Nevertheless, in late July 2025,

Mr. Maloney sent Ms. Wang a draft Billionaire Index profile for Plaintiff that Bloomberg intended to publish. Compl., ¶ 33.  Not only did the draft Billionaire Index profile contain numerous inaccuracies about Plaintiff's personal history and his wealth, but it also contained the Cryptocurrency Breakdown.  *Id.*

On or around August 2, 2025, counsel for Plaintiff sent Bloomberg a cease-and-desist letter, demanding Bloomberg immediately cease and desist from any use, disclosure, or publication of any information—verbal or written—regarding Plaintiff's financial holdings other than the total net worth and the asset type and classification.  Declaration of Isabelle Corbett Sterling ("Sterling Decl."), ¶ 2.  After numerous discussions with Bloomberg's Global Newsroom Counsel, Bloomberg confirmed its intent to publish the Cryptocurrency Breakdown.  *Id.*, ¶ 5.  While no timeline was given, Plaintiff's counsel was informed that publication would occur "imminently." *Id*.

### D.    **Plaintiff Will Be Imminently And Irreparably Harmed By The Publication Of His Confidential Financial Information.**

Despite its express promise of confidentiality, which Plaintiff detrimentally relied upon, Bloomberg intends to publish Plaintiff's specific financial holdings—in shockingly granular detail—alongside misstatements about Plaintiff's holdings.  The disclosure of Plaintiff's specific cryptocurrency holdings would not only constitute a substantial invasion of Plaintiff's privacy but will subject Plaintiff (and his family) to a significant and imminent risk of theft, hacking, kidnapping, and bodily harm.

Although it may appear harmless, disclosing the amount of cryptocurrency held by an individual, particularly when it is a distinctive amount, is a significant violation of one's privacy, facilitates de-anonymization (identification of the wallets held by or associated with that

individual), exposes digital assets to malicious actors, and heightens the risk of theft, phishing, and even acts of violence

       This is because most public blockchains are open and transparent, meaning that all transaction IDs,[2] wallet addresses,[3] and corresponding balances ***are publicly visible***. Declaration of Clifford Koutsky ("Koutsky Decl."), ¶ 4. By default, wallet owners are anonymous. However, knowing a characteristically distinctive amount of cryptocurrency held by a particular person enables identification of a wallet address or wallet addresses belonging to that person. *See id.*, ¶¶ 4-5. For example, a person can analyze the transactions of a particular wallet because the public blockchain shows the sender and recipient wallet addresses of all transactions. *Id*. It is also publicly visible how a wallet interacts with crypto exchanges for fiat on-ramps or off-ramps—e.g., exchange cryptocurrency for traditional tenders. *Id.*, ¶ 6. Since most centralized crypto exchanges follow Know Your Customer ("KYC") regulations, they typically have personally identifiable information ("PII") and linked banking details of the wallet owner. *Id*. Once the identity of the owner of a specific wallet and the wallet's value are exposed, the owner becomes a target for extortion, phishing, or social engineering. *See id.*, ¶¶ 9-14.

       Even if Plaintiff has multiple wallets holding various amounts of cryptocurrency, there is still a significant risk of wallet de-anonymization. Indeed, ***linked wallets*** can be identified through address clustering techniques, which analyze patterns such as common inputs, transaction flows, or behavioral signals—often indicating multiple addresses are controlled by the same individual or entity. *Id.*, ¶ 7. It is also possible to trace a wallet holder's assets across different blockchains

---

[2] A transaction ID, or transaction hash, can be thought of as an identification number that labels each transaction on the blockchain. Koutsky Decl., ¶ 5 n.3.

[3] A cryptocurrency wallet address is a unique string of characters used to send and receive cryptocurrencies. It identifies an account on the blockchain, allowing others to find an account to send digital assets. Koutsky Decl., ¶ 5 n.4.

or crypto assets by looking at activity on various platforms that act as connecting points between different blockchains—e.g., cross-chain bridges, decentralized exchange aggregators, or centralized exchanges. Koutsky Decl., ¶ 7. Furthermore, potential bad actors can correlate wallet addresses indirectly by comparing transaction metadata—such as closely matched transaction timestamps, transferred amounts, and gas fees—to build probabilistic associations between wallets across chains. *Id.* There are numerous data analytics firms—Chainalysis, TRM Labs, and Elliptic—that specialize in facilitating this deanonymization process. *Id.*, ¶ 8.

By publishing the details of Plaintiff's specific crypto holdings without his consent, Bloomberg is not only violating Plaintiff's financial privacy, but worse, handing potential bad actors vital information that they can (and will) use to identify Plaintiff's crypto wallet(s). Therefore, publicly revealing the amounts of Plaintiff's cryptocurrency holdings exposes otherwise private information that introduces serious risks. The following is a breakdown of some of the known dangers:

- **Kidnapping and Ransom Threats.** Crypto is transferable without third-party oversight, making it an ideal medium for ransom demands. *Id.*, ¶ 12. There have been real-world cases of crypto holders being physically attacked or kidnapped and forced to transfer funds. *Id.*, Exhs. A - D. Public wallet visibility increases the risk of such scenarios. *Id.*, ¶ 12.

- **Digital Attacks.** Once a wallet holder is known, attackers may monitor for signs of private key reuse, insecure transactions, timing vulnerabilities, or attempt SIM swaps or compromise devices tied to the wallet's owner. *Id.*, ¶ 13.

- **Irreversibility of Theft.** Unlike traditional financial systems, crypto transactions are irreversible. If someone is coerced, hacked, or scammed out of their funds, there is little or no recourse. Koutsky Decl., ¶ 15.

Publishing Plaintiffs' cryptocurrency amounts provides bad actors with information otherwise unavailable to them that undermines Plaintiff's personal and operational security and exposes him to the imminent and irreparable risk of theft, hacking, kidnapping, and bodily harm. Public visibility of large wallet balances on public blockchains makes wrench attacks on the owner or the owner's close associates more attractive to bad actors. *Id.*, ¶ 16. Some reports claim that wrench attacks are now happening on a weekly basis. *Id.* Incidents range from kidnapping and torture to mutilation. *Id.* For example, in New York an Italian entrepreneur was tortured for weeks. *Id.* In France, victims have had fingers severed as ransom coercion. *Id.* As crypto enters mainstream finance, criminals comfortable with violence are increasingly targeting wealthy crypto holders. *Id.* Publicly visible crypto holdings lure violent criminals—who exploit both digital knowledge and real-world access to extract assets. *Id.*

## III.   <u>LEGAL STANDARD</u>

Plaintiff's right to a preliminary injunction depends on "(1) whether the movant has shown a likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the relief is denied; (3) whether granting relief will result in even greater harm to the nonmoving party; and (4) whether the public interest favors such relief." *Bancroft*, 456 F. App'x at 188 (citing *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010)). District courts within the Third Circuit apply the same standard to both motions for a temporary restraining order and for preliminary injunctions. *See Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*, No. CV 14-1268-SLR, 2014 WL 5088690, at *1 (D. Del. Oct. 9, 2014) ("A request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction.") (citation

omitted).   A temporary restraining order is particularly appropriate where "a party faces the possibility of irreparable harm," and the relief is needed "to preserve the status quo and prevent such irreparable harm." *CrowdStrike, Inc. v. NSS Labs, Inc.*, No. CV 17-146-GMS, 2017 WL 588713, at *1 (D. Del. Feb. 13, 2017).   When a preliminary injunction seeks to halt the disclosure of confidential information, the "confidential information need not actually be disclosed or used— threatened disclosure or use may be sufficient to warrant injunctive relief.   *Cabela's LLC v. Highby*, 362 F. Supp. 3d 208, 224 (D. Del. 2019), *aff'd*, 801 F. App'x 48 (3d Cir. 2020).

## IV.   ARGUMENT

### A.   Plaintiff is Likely to Succeed on the Merits of his Claims.

To meet the threshold requirement of reasonable likelihood of success on the merits, one "only needs to show that he has a reasonable probability of eventual success in the litigation, but not necessarily that he is more likely to succeed."  *Zimmerman v. Int'l Longshoreman's Assoc. Local 1694*, No. 1:22-CV-01192-JCG, 2024 WL 3104957 at *12 (D. Del. June 24, 2024) (D. Del. June 24, 2024) (citing *Reilly v, City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)).

To prevail on a claim for promissory estoppel, Plaintiff will need to show, "1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *CKSJB Holdings LLC v. EPAM Sys., Inc.*, 837 F. App'x 901, 905 (3d Cir. 2020).  Under Delaware law, a promissory estoppel claim is established where a defendant made a promise to maintain the confidentiality of information disclosed to the defendant, and the plaintiff chose to continue to engage with the defendant based on the promise of confidentiality.  *See Fanean v. Rite Aid Corp. of Delaware*, 984 A.2d 812, 821–23 (Del. Super. 2009).  And, where information is  provided to defendant only after plaintiff secures assurances of confidentiality, such evidence supports a finding that plaintiff

reasonably relied on defendant's promise to their detriment.  *See Lord v. Peninsula United Methodist Homes, Inc.,* No. CIV.A. 97C-10-012, 2001 WL 392237 at *3 (Del. Super. Apr. 12, 2001).

Here, Plaintiff has a strong likelihood of success on his promissory estoppel claim.  In the voice conversations between Ms. Shen and Plaintiff prior to Plaintiff's decision to participate in the Billionaires Index and provide his Confidential Financial Information, Bloomberg made express promises that any information Plaintiff provided to Bloomberg for the purpose of verifying his personal wealth would be kept strictly confidential and would only be used to verify his personal assets.  Bloomberg made this promise for the purpose of inducing Plaintiff to provide the Confidential Financial Information so Bloomberg could develop the Billionaire's Index profile on Plaintiff.  Without this promise, Plaintiff would not have disclosed the Confidential Financial Information, the exposure of which presents significant security and privacy risks to Plaintiff.  Because Plaintiff can easily establish each element of the claim, Plaintiff has a strong likelihood of succeeding on the merits.  Moreover, and as discussed in greater detail below, Plaintiff's claim will overcome any first amendment challenges raised by Defendants.  As the Supreme Court has held, "the First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law."  *Cohen v. Cowles Media Co*., 501 U.S. 663, 672 (1991).

Plaintiff also has a reasonable probability of succeeding on his claim for public disclosure of private facts, for which Plaintiff will need to show "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and

(b) is not of legitimate concern to the public." *Spence v. Cherian*, 135 A.3d 1282, 1288 (Del. Super. 2016).

While the Third Circuit has not yet addressed these elements as applied to the exposure of private financial information related to cryptocurrency, the Northern District of California has determined that a customer who purchased Ledger SAS hardware wallet to protect his cryptocurrency assets stated a privacy injury under the public disclosure of private facts elements after his identifying information was posted on the dark web, in conjunction with the fact that he owns a Ledger wallet. *Baton v. Ledger SAS*, 740 F. Supp. 3d 847 (N.D. Cal. 2024). The court explained "it would be highly offensive to a reasonable person to have one's [personally identifiable information] in conjunction with one's confidential financial information (as indicated by [plaintiff's] ownership of the wallet and thus his ownership in crypto wealth) disclosed to the public at large." *Id.* at 875. The court explained that "the fact that one owns a Ledger wallet indicates that they have significant crypto-assets" which "would be offensive to a reasonable person in part because it would make a victim a 'ready target[ ] for targeted phishing and extortion attacks.'" *Id.* at 876.

The Court further noted that "there is no reason why one's confidential financial information would be of concern to the public. This information is not of public record, it is otherwise confidential, and it was released in conjunction with [plaintiff's] full name, so his anonymity is not preserved." *Id.* at 875–76. Likewise, several federal courts have found that disclosure of private financial information such as social security numbers are not of legitimate public interest. *See Florence v. Ord. Express, Inc.*, 674 F. Supp. 3d 472, 480 (N.D. Ill. 2023) ("social security numbers and driver's license numbers, of course, are not of legitimate public concern"); *Duffy v. Lewis Bros. Bakeries, Inc.*, 760 F. Supp. 3d 704, 716 (S.D. Ind. 2024) ("An

individual's social security number is private information that is not of legitimate public concern. (internal quotation omitted)); *Purdy v. Burlington N. & Santa Fe Ry*. Co., No. 0:98-CV-00833-DWF, 2000 WL 34251818 at *4 (D. Minn. Mar. 28, 2000), *aff'd sub nom. Purdy v. Burlington N. Santa Fe Corp*., 21 F. App'x 518 (8th Cir. 2001) (Defendant "has offered no explanation for how the public might have a legitimate concern in individual social security numbers.")

Here, Bloomberg threatens to publicize the Cryptocurrency Breakdown, comprised of Plaintiff's Confidential Financial Information, to millions of online readers.  This publication would be highly offensive to a reasonable person because, as the *Baton* court explained, the knowledge of what cryptocurrency Plaintiff owns will make him an increased target for theft, which may come by way of hacking, phishing, social engineering, kidnapping, or bodily injury. If anything, Plaintiff will be at significantly greater risk than plaintiff in *Baton,* because Bloomberg threatens to disclose the amounts of cryptocurrencies Plaintiff owns, aiding third parties in identifying which wallets belong to Plaintiff, after which bad actors can use a variety of methods to obtain the passphrase or seedphrase which enable theft of the funds from the wallet.  This exposure to risk of theft, hacking, kidnapping, and bodily harm is highly offensive.

Furthermore, the Cryptocurrency Breakdown is not of legitimate public interest.  One of the many utilities of cryptocurrency is to maintain confidentiality of financial information, and this information is not otherwise a matter of public record.  The Cryptocurrency Breakdown is, like a social security number, a piece of private, personal information in which the public has no legitimate interest.  Accordingly, Plaintiff has a reasonable likelihood of success on his claim for public disclosure of private facts.

### B.    Plaintiff Will Be Irreparably Harmed Absent an Injunction.

A TRO is appropriate here where the harm that Plaintiff will suffer if the Cryptocurrency Breakdown is published online cannot be remediated, even if Defendants are later required to

remove the information from their publications.  As discussed above, if Plaintiff's Cryptocurrency

Breakdown is publicized, Plaintiff will be at imminent risk of theft, hacking, kidnapping, and

bodily harm. By the nature of internet publication, the harm to Plaintiff cannot be repaired.  As the

District of New Jersey explained,

> Once this protected information is disclosed to the general public via the Internet, it will
> permanently and irreversibly be stripped of its confidential status. Even if Plaintiffs' home
> addresses are subsequently removed the Internet registry following final resolution of
> Plaintiffs' privacy claims, there is no legal or equitable remedy available to retrieve this
> information and prevent its further dissemination by those who, in the interim, will have
> accessed the web site.

*A.A. v. New Jersey*, 176 F. Supp. 2d 274, 307 (D.N.J. 2001), *aff'd in part, remanded in part sub*

*nom. A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206 (3d Cir. 2003); *see also GTE Sylvania Inc. v.*

*Consumer Prod. Safety Comm'n*, 404 F. Supp. 352, 373–74 (D. Del. 1975) ("[O]nce [] information

is disseminated, the Court becomes powerless to protect or to restore the status quo pending a final

determination of the merits.").  Indeed, "[a] preliminary injunction is especially appropriate where

the action sought to be enjoined would 'impair the court's ability to grant an effective remedy.'"

*GTE Sylvania Inc.*, 404 F. Supp. at 373–74 (citing 11 Wright & Miller, Federal Practice and

Procedure Sec. 2948, p. 431 (1973)).

No remedy the Court could later grant would repair the harm caused by publication.  The

information regarding Plaintiff's cryptocurrency holdings would be public knowledge forever, and

the reduction in Plaintiff's physical and financial safety would be made permanent.  Accordingly,

this factor weighs in favor of the grant of the TRO.

## C.    <u>Granting Relief Will Not Result in Greater Harm to the Nonmoving Party.</u>

Under the third factor for a preliminary injunction, a court must "balance the parties'

relative harms; that is, the potential injury to the [movant] without this injunction versus the

potential injury to the [non-movant] with it in place."  *Securities & Exchange Commission v.*

14

*Chappell*, 107 F.4th 114, 118 (3d Cir. 2024) (citation and quotation omitted).  This balance of equities favors Plaintiff.

Defendants will suffer no injury if they are prohibited from publishing a chart showing what quantities of different cryptocurrencies Plaintiff owns.  While Defendants may claim that their right to free speech would be infringed by a TRO, "the First Amendment does not provide a right to disregard promises that would otherwise be enforced under state law." *Barlow v. Serv. Emps. Int'l Union Loc. 668*, 90 F.4th 607, 616 (3d Cir. 2024); *see also Fischer v. Governor of New Jersey*, 842 F. App'x 741, 753 (3d Cir. 2021) ("[T]he state common law of contracts is a 'law of general applicability' that does not run afoul of First Amendment principles." (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).  Indeed, the Third Circuit has acknowledged that First Amendment rights "may be waived under particular circumstances" if the waiver is "voluntary, knowing, and intelligent." *Erie Telecommunications, Inc. v. City of Erie, Pa*., 853 F.2d 1084, 1094 (3d Cir. 1988). "Court enforcement of a private agreement to limit a party's ability to speak or associate does not necessarily violate the First Amendment." *Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d 192, 205 (3d Cir. 2012).  This principle applies no differently to promissory estoppel claims than to traditional breach of contract. *See Cohen,* 501 U.S. at 664 (holding that because promissory estoppel is law of general applicability, the First Amendment did not prohibit a journalist's source from claim against for newspaper publisher for breaching of promise of confidentiality in exchange for the information).  "Put simply, the First Amendment does not provide a right to 'disregard promises that would otherwise be enforced under state law.'" *Fischer*, 842 F. App'x at 753 (citing *Cohen*, 501 U.S. at 670).

Here, Bloomberg waived its first amendment rights by assuring Plaintiff of the confidentiality of the information they sought from him.  Defendants' harm if they are prohibited

from publishing the information they already promised not to publish is nonexistent. In comparison, and addressed above, Plaintiff's harm from any disclosure of the Cryptocurrency Breakdown is substantial. Accordingly, the balance of the equities weighs in favor of Plaintiff.

### D. An Injunction Will Serve the Public Interest.

The public interest factor also strongly favors entering Plaintiff's requested injunction. "The public has a strong interest in seeing that contract … rights are respected." *Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc*., 138 F. App'x 431, 434–35 (3d Cir. 2005). Here, the public has an interest in ensuring journalists keep their promises to their sources, in order to encourage the free exchange of information. Moreover, district courts in the Third Circuit have recognized that "[t]he public has an interest in protecting the privacy rights of its citizens." *Wolfson v. Lewis*, 924 F. Supp. 1413, 1435 (E.D. Pa. 1996); *see also Does v. City of Trenton Dep't of Pub. Works,* 565 F. Supp. 2d 560, 571 (D.N.J. 2008) (privacy interests outweighed "weak public interest in the disclosure of [individual's names and addresses]"). No public interest will be served by the publication of Plaintiff's Cryptocurrency Breakdown. Accordingly, this factor weighs in favor of the requested TRO.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion and enter an order prohibiting Defendants from publishing the amounts of any specific cryptocurrency owned by Plaintiff.

Dated:  August 11, 2025                    BAKER & HOSTETLER LLP

                                           /s/  Jeffrey J. Lyons
                                           Jeffrey J. Lyons (#6437)
                                           1201 North Market Street, Suite 1407
                                           Wilmington, DE 19801
                                           (302) 407-4222
                                           jjlyons@bakerlaw.com

                                           *Attorney for Plaintiff Yuchen Justin Sun*