IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUN, YUCHEN JUSTIN, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 25-1007 (CFC) |
| | ) | |
| v. | ) | |
| | ) | |
| BLOOMBERG, L.P., and | ) | |
| BLOOMBERG, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT
## OF RENEWED MOTION FOR A TEMPORARY
## <u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

Dated: September 11, 2025

BAKER & HOSTETLER LLP
Jeffrey J. Lyons (#6437)
1201 N. Market Street, Suite 1407
Wilmington, DE 19801-1147
(302) 468-7088
jjlyons@bakerlaw.com

*Attorney for Plaintiff Yuchen Justin Sun*

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION..................................................................................1

II.  STATEMENT OF FACTS ....................................................................2

   A.  Bloomberg Approached Mr. Sun About Inclusion in Billionaires Index. .......2

   B.  Bloomberg Agreed To Maintain the Confidentiality of Mr. Sun's
   Confidential Information. ...................................................................3

   C.  Despite its Promises of Confidentiality, Bloomberg Published Mr. Sun's
   Confidential Information. ...................................................................6

   D.  Mr. Sun Will Be Imminently And Irreparably Harmed By The Continued
   and Additional Publication of His Confidential Information. ...............8

III. LEGAL STANDARD ..........................................................................11

IV.  ARGUMENT .....................................................................................12

   A.  Mr. Sun is Likely to Succeed on the Merits of his Claims. ...........12

   B.  Mr. Sun Will Be Irreparably Harmed Absent an Injunction. ........16

   C.  Granting Relief Will Not Result in Greater Harm to the Nonmoving Party. 18

   D.  An Injunction Will Serve the Public Interest.................................20

V.   CONCLUSION ..................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. v. New Jersey*,
176 F. Supp. 2d 274 (D.N.J. 2001) ....................................................................17

*Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*,
456 F. App'x 184 (3d Cir. 2012) .......................................................................12

*Barlow v. Serv. Emps. Int'l Union Loc. 668*,
90 F.4th 607 (3d Cir. 2024) ..............................................................................18

*Baton v. Ledger SAS*,
740 F. Supp. 3d 847 (N.D. Cal. 2024)..........................................................15, 16

*Cabela's LLC v. Highby*,
362 F. Supp. 3d 208 (D. Del. 2019)...................................................................12

*CKSJB Holdings LLC v. EPAM Sys., Inc.*,
837 F. App'x 901 (3d Cir. 2020) .......................................................................13

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991)......................................................................................14, 19

*CrowdStrike, Inc. v. NSS Labs, Inc.*,
2017 WL 588713 (D. Del. Feb. 13, 2017)..........................................................12

*Democratic Nat. Comm. v. Republican Nat. Comm.*,
673 F.3d 192 (3d Cir. 2012) .........................................................................19, 20

*Does v. City of Trenton Dep't of Pub. Works*,
565 F. Supp. 2d 560 (D.N.J. 2008)....................................................................21

*Fanean v. Rite Aid Corp. of Delaware*,
984 A.2d 812 (Del. Super. 2009)........................................................................13

*Florence v. Ord. Express, Inc.*,
674 F. Supp. 3d 472 (N.D. Ill. 2023)..................................................................15

*GTE Sylvania Inc. v. Consumer Prod. Safety Comm'n*,
404 F. Supp. 352 (D. Del. 1975)........................................................................17

*Lord v. Peninsula United Methodist Homes, Inc.*,
    2001 WL 392237 (Del. Super. Apr. 12, 2001) ....................................................13

*Purdy v. Burlington N. & Santa Fe Ry. Co.*,
    2000 WL 34251818 (D. Minn. Mar. 28, 2000) ...........................................15, 16

*Purdy v. Burlington N. Santa Fe Corp.*,
    21 F. App'x 518 (8th Cir. 2001) ..........................................................................16

*Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*,
    138 F. App'x 431 (3d Cir. 2005) .........................................................................21

*Securities & Exchange Commission v. Chappell*,
    107 F.4th 114 (3d Cir. 2024) ...............................................................................18

*Spence v. Cherian*,
    135 A.3d 1282 (Del. Super. 2016).......................................................................14

*Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*,
    2014 WL 5088690 (D. Del. Oct. 9, 2014) ...........................................................12

*Wolfson v. Lewis*,
    924 F. Supp. 1413 (E.D. Pa. 1996)......................................................................21

*Zimmerman v. Int'l Longshoreman's Assoc. Local 1694*,
    2024 WL 3104957 (D. Del. June 24, 2024) .........................................................13

## I.    <u>INTRODUCTION</u>

Plaintiff Yuchen Justin Sun ("Plaintiff" or "Mr. Sun") initiated this action and filed an initial Motion for Temporary Restraining Order ("TRO") to enjoin Defendants Bloomberg, L.P. and Bloomberg, Inc. ("Bloomberg" or "Defendants") from disclosing his highly confidential, sensitive, private, and proprietary financial information ("Confidential Information"). D.I. 1, 3. Despite receiving a cease-and-desist letter from Mr. Sun's legal counsel and detailed warnings from multiple expert blockchain analytics professionals outlining the substantial risks and harm, Bloomberg moved forward and published Mr. Sun's specific financial holdings—in shockingly granular detail—alongside false statements regarding his cryptocurrency holdings in Tronix (or TRX).

In a good faith effort to expedite resolution and mitigate harm, Mr. Sun voluntarily withdrew his initial TRO (D.I. 15), trusting that once Defendants had more information, they would act responsibly to prevent further injury. Unfortunately, this trust was misplaced. Accordingly, Mr. Sun renews his request for a TRO, which seeks an order compelling Bloomberg to remove any published references to the specific amounts of cryptocurrency he owns, or in the alternative, force Blomberg to retract and publish Mr. Sun's correct TRX holdings. As outlined below, because Mr. Sun is likely to succeed on the merits, will suffer significant and

irreparable harm if Bloomberg is not enjoined, and, because the balance of the equities and public interest are in his favor, Mr. Sun's TRO should be granted.

## II.   STATEMENT OF FACTS

### A.   Bloomberg Approached Mr. Sun About Inclusion in Billionaires Index.

Mr. Sun is a successful entrepreneur in blockchain and cryptocurrency. D.I. 1 ¶2. Most notably, Mr. Sun is the founder of TRON, a blockchain platform that has become one of the most active open blockchain platforms in the world with over 300 million accounts. *Id.* Given his success, Mr. Sun has accumulated a sizable portfolio of various cryptocurrencies and other valuable assets. *Id.*

Bloomberg maintains an online "Billionaires Index," inviting its audience to "[v]iew profiles for each of the world's 500 richest people, see the biggest moves, and compare fortunes or track returns."[1] On or around February 2025, Muyao Shen, a journalist from Bloomberg, contacted Mr. Sun expressing Bloomberg's interest in interviewing Mr. Sun. Declaration of Sprina Wang ("Wang Decl.") ¶6. On February 11, 2025, Mr. Sun's team informed Ms. Shen that Mr. Sun needed to defer any interview because of other media commitments. *Id.* ¶7. Ms. Shen subsequently suggested that Bloomberg could feature Mr. Sun on the Bloomberg Billionaires Index. *Id.* Bloomberg wrote Mr. Sun that to be featured in the Billionaires Index, he

---

[1] Bloomberg Billionaires Index, https://www.bloomberg.com/billionaires/.

would need to "prove" his personal wealth by providing Bloomberg with specific detailed information related to his ownership of cryptocurrencies, which is highly confidential, sensitive, private, and proprietary information. *Id.*, Ex. A. Bloomberg told Mr. Sun that this effort was necessary to "compil[e] net worth *estimates*" for the Index, and Ms. Wang expressed concerns about "privacy issues" from the start. *Id.* at 2-3 (emphasis added).

### B. Bloomberg Agreed To Maintain the Confidentiality of Mr. Sun's Confidential Information.

In February 2025, prior to providing Bloomberg with his Confidential Information, Mr. Sun had multiple conversations with Ms. Shen. Declaration of Yuchen Justin Sun ("Sun Decl.") ¶6. During those conversations, Mr. Sun voiced his significant confidentiality and data security concerns. *Id.* Ms. Shen assured Mr. Sun that any information Mr. Sun provided to Bloomberg for the purpose of verifying his personal wealth would be kept strictly confidential and only be used to verify his personal assets for the Billionaires Index profile. *Id.*

Mr. Sun verified Ms. Shen's assurances by reviewing Bloomberg's established practice related to reporting cryptocurrency assets in the Billionaires Index and confirmed that Bloomberg did not publish specific cryptocurrency holdings beyond bitcoin or any non-public information. *Id.* ¶¶7–8. Based on Ms. Shen's representations and Bloomberg's established practice, Mr. Sun understood that the ***only information*** to be reported in Bloomberg's Billionaires Index was the total sum

3

of Mr. Sun's personal wealth with a ***general breakdown*** of the asset types and sources of Mr. Sun's wealth. *Id*. ¶¶6–7. Ms. Shen represented to Mr. Sun that his holdings would be reported in a single lump sum amount as "cryptocurrency" holdings, and that prior publications only included lump sums and did not contain granular details. *Id*. ¶7. To be clear, Mr. Sun believed his investments would not be broken down by individual cryptocurrency. *Id*. Based on this confirmed understanding, Mr. Sun decided to participate in the Billionaires Index. *Id*. ¶¶7–8.¶

In reliance on Bloomberg's express assurances, and documented reporting practices, Mr. Sun agreed to provide Bloomberg with his Confidential Information solely to verify his eligibility for the Bloomberg Billionaires Index. Mr. Sun would not have participated or provided his Confidential Information had he known that Bloomberg would publish granular details about his cryptocurrency assets. *Id.* ¶9.

Throughout the verification process, Bloomberg repeatedly affirmed its confidentiality commitments to Mr. Sun. In February 2025, Bloomberg journalist Mr. Sloan, assured Mr. Sun's team that any access to Mr. Sun's Confidential Information will be "within the Bloomberg office, which is a secure network." Wang Decl., Ex. B at 1. To emphasize the sensitivity of the Confidential Information, Timothy Chung, a technology staff member at TRON, stated "[w]e also hope that only trust & limited people have access right for the documents, which can maximize the protection of our data." *Id.* Mr. Sloan replied, "Yes, definitely." *Id.* Even with

Mr. Chung's limited command of the English language, he solicited, and Bloomberg confirmed, that the Confidential Information was to remain confidential and in a secure environment.

On March 25, 2025, as the verification process continued, Mr. Sun repeatedly continued to stress the sensitivity of his Confidential Information and reiterated the parties' prior agreement regarding the limited use of, and the protection of the confidentiality of, his information in the Telegram Chat. *Id*. at 3 ("**All information shared within the group is strictly confidential and for verification purposes only**." (emphasis added)). Bloomberg did not object to Mr. Sun's assertion of confidentiality or otherwise reject Mr. Sun's repeated understanding of the parties' agreement as to the limited use for verification, and protection of his Confidential Information. *Id*. Two months later, Bloomberg responded with the valuation estimate. *Id*. Throughout the parties' discussions, Bloomberg consistently responded to Mr. Sun's team with immediate—and at times forceful—objections to any statements it deemed inaccurate or inconsistent with prior communications. *See, e.g.*, *id*. at 4–5 (messaging within 14 minutes and fewer than 120 minutes to indicate receipt of message and disagreement); 5 (messaging disagreement within three minutes of receipt of message). Bloomberg's usual attentiveness and readiness to challenge perceived misrepresentations makes its silence in this case especially

telling—signaling to Mr. Sun that Bloomberg agreed with his interpretation of protection.

### C. Despite its Promises of Confidentiality, Bloomberg Published Mr. Sun's Confidential Information.

In late July, Mr. Sun's team learned that Ms. Shen was using figures from the Confidential Information in an unrelated Bloomberg article. Wang Decl., Ex. B at 4. Bloomberg also revealed plans to publish a detailed breakdown of Mr. Sun's cryptocurrency holdings ("Cryptocurrency Breakdown"). *Id.* ¶18. The Cryptocurrency Breakdown was far beyond what is usually included in the Bloomberg Billionaires Index and was contrary to Ms. Shen's representations. Sun Decl. ¶13. These revelations stunned Mr. Sun and his team, given Bloomberg's repeated assurances of confidentiality.

On or around August 2, 2025, Mr. Sun demanded through his counsel that Bloomberg limit its publication of his financial holdings to his total net worth, the asset type and classification. Declaration of Isabelle Corbett Sterling ("Sterling Decl.") ¶2. Between August 7 and August 11, 2025, Mr. Sun's counsel engaged in multiple meet-and-confer and settlement discussions with Bloomberg and its counsel to discuss the anticipated publication of Mr. Sun's Confidential Information and the material inaccuracies Bloomberg intended to publish. *Id.* ¶¶3–7. Mr. Sun's counsel included cryptocurrency experts in these discussions to explain the risks and potential harm Mr. Sun could face if the details of his crypto holdings were

published. *See, e.g.*, *id.* ¶7. Following these expert-led calls, email correspondence revealed that Bloomberg lacked a fundamental understanding of blockchain technology and failed to fully grasp the grave implications conveyed by the experts. *Id.* ¶¶5–6.

On August 11, 2025, Plaintiff filed this lawsuit and a motion for TRO to stop Bloomberg from publishing his Confidential Information. D.I. 1, 3. Just hours earlier, Bloomberg moved forward and published, in granular detail, Mr. Sun's Confidential Information in its Billionaires Index, along with false claims that he controls the majority of the TRX supply.

On August 14, Mr. Sun withdrew his motion for TRO based on Bloomberg's promise to engage in good faith efforts to resolve his concerns and avoid unnecessary litigation. Sterling Decl. ¶10. In fact, a substantial portion of the TRX that Bloomberg mischaracterizes as Mr. Sun's personal holdings is held in ecosystem wallets and exchange custodial wallets—structures designed to support the network and safeguard customer assets. Despite this obvious error, Bloomberg has not removed Mr. Sun's Confidential Information nor corrected the inaccurate TRX data from Mr. Sun's profile. *Id.* ¶12. Bloomberg also plans to publish a second article including a Cryptocurrency Breakdown and possibly more Confidential Information. Wang Decl., Ex. B at 4.

**D.    Mr. Sun Will Be Imminently And Irreparably Harmed By The Continued and Additional Publication of His Confidential Information.**

The unauthorized disclosure of Mr. Sun's specific cryptocurrency holdings constitutes a substantial invasion of Mr. Sun's privacy and subjects Mr. Sun (and his family) to a significant and imminent risk of theft, hacking, kidnapping, and bodily harm. Indeed, the longer the Cryptocurrency Breakdown remains on the internet, the more extensively the information will be shared and the greater the risks.

Cryptocurrency holdings are unlike other types of assets and to maintain the safety of the assets, certain information including the details of the Confidential Information must remain confidential. This is because on public blockchains all transactions,[2] wallet addresses,[3] and corresponding balances ***are publicly visible***. Declaration of Clifford Koutsky ("Koutsky Decl.") ¶4 (emphasis added). By default, wallet owners are pseudo-anonymous. However, knowing a distinctive amount of cryptocurrency held by a particular person enables identification of a wallet or wallets belonging to that person. *Id.* ¶¶4–5. From there, a person can analyze the transactions of a particular wallet and identify exchanges on which it transacts. *Id.* Since most centralized crypto exchanges follow Know Your Customer ("KYC")

---

[2] A transaction ID is unique and assigned to each transaction on the blockchain. Koutsky Decl. ¶ 5 n.3.

[3] A cryptocurrency wallet address is a unique string of characters used to send and receive cryptocurrencies. It identifies an account on the blockchain, allowing others to find an account to send cryptocurrencies. Koutsky Decl. ¶ 5 n.4.

regulations, they have personally identifiable information ("PII") and linked banking details of the wallet owner. *Id.* Once the identity of the owner of a specific wallet and the wallet's value are exposed, the owner becomes a target for extortion, phishing, or social engineering, directly and through counterparties and exchanges. *Id.* ¶¶ 9–14.

Even if Mr. Sun has multiple wallets holding various amounts of cryptocurrency, there is still a significant risk of wallet de-anonymization. Indeed, ***linked wallets*** can be identified through address clustering techniques, which analyze patterns such as common inputs, transaction flows, or behavioral signals— often indicating multiple addresses are controlled by the same individual or entity. *Id.* ¶7. Furthermore, potential bad actors can correlate wallet addresses indirectly by comparing transaction metadata—such as closely matched transaction timestamps, transferred amounts, and gas fees—to build probabilistic associations between wallets across chains. *Id.*

Publicly revealing the amounts of Mr. Sun's cryptocurrency holdings exposes otherwise private information that introduces serious risks. The following is a breakdown of some of the known dangers:

- **Kidnapping and Ransom Threats.** Crypto is transferable without third-party oversight, making it an ideal medium for ransom demands. Koutsky

Decl. ¶12 & Exs. A–D (examples of crypto holders being physically attacked or kidnapped and forced to transfer funds).

- **Digital Attacks.** Once a wallet holder is known, attackers may monitor signs of private key reuse, insecure transactions, timing vulnerabilities, or attempt SIM swaps or compromise devices tied to the wallet's owner. *Id.* ¶13.

- **Irreversibility of Theft.** Unlike traditional financial systems, crypto transactions are irreversible. If someone is coerced, hacked, or scammed out of their funds, there is little or no recourse. *Id.* ¶15.

As crypto enters mainstream finance, criminals comfortable with violence are increasingly targeting wealthy crypto holders. *Id.* ¶16. Publicly visible crypto holdings lure violent criminals—who exploit both digital knowledge and real-world access to extract assets. *Id.* ¶16. Some reports claim that wrench attacks are now happening on a weekly basis.[4] *Id.* Incidents range from kidnapping and torture to mutilation. *Id.* For example, in New York, an Italian entrepreneur was tortured for weeks. *Id.* In France, victims have had fingers severed as ransom coercion. *Id.* Thus, by publishing the details of Mr. Sun's specific crypto holdings without his consent,

---

[4] Alan Suderman, *Why "Wrench Attacks" on Wealthy Crypto Holders Are on the Rise*, Associated Press (May 28, 2025), https://apnews.com/article/crypto-bitcoin-kidnapping-wrench-attack-ddc7263c25ba590f85648e1682576971; The Journal Podcast, *Severed Fingers and Wrench Attacks: A New Era in Crypto Crime*, Wall Street Journal (June 20, 2025), https://www.wsj.com/podcasts/the-journal/severed-fingers-and-wrench-attacks-a-new-era-in-crypto-crime/6618b5cb-2e54-4fdb-8441-c8a1ab908c05?gaa_at=eafs&gaa.

Bloomberg not only violated Mr. Sun's financial privacy but, worse, handed bad actors vital information that they can (and will) use to identify Mr. Sun's crypto wallet(s) and subjecting him to serious and imminent risk of harm.

Additionally, by inflating his TRX holdings, Bloomberg exposes Mr. Sun to additional legal, financial, and physical harm. *See* Wang Decl., ¶¶22-24. The false claim that Mr. Sun controls a majority of TRX undermines trust and the decentralization core in the TRON network, which could discourage investment and trigger a massive sell-off of TRX, causing substantial financial harm to Mr. Sun and others who currently own TRX. *Id.* Further, if fintech entrepreneurs and developers perceive TRON as dominated by a single individual, they may avoid building in that ecosystem and deprive the network of innovation and capital. Finally, regulators rely on accurate attribution; Bloomberg's mislabeling risks prompting misguided enforcement actions. *Id.*

## III.   **LEGAL STANDARD**

Mr. Sun's right to a preliminary injunction depends on "(1) whether the movant has shown a likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the relief is denied; (3) whether granting relief will result in even greater harm to the nonmoving party; and (4) whether the public interest favors such relief." *Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 F. App'x 184, 188 (3d Cir. 2012) (citation omitted). District courts within the

Third Circuit apply the same standard to both motions for a temporary restraining order and for preliminary injunctions. *See Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*, 2014 WL 5088690, at *1 (D. Del. Oct. 9, 2014) ("A request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction.") (cit. omitted). A temporary restraining order is particularly appropriate where "a party faces the possibility of irreparable harm," and the relief is needed "to preserve the status quo and prevent such irreparable harm." *CrowdStrike, Inc. v. NSS Labs, Inc.*, 2017 WL 588713, at *1 (D. Del. Feb. 13, 2017). When a preliminary injunction seeks to halt the disclosure of confidential information, the "confidential information need not actually be disclosed or used—threatened disclosure or use may be sufficient to warrant injunctive relief. *Cabela's LLC v. Highby*, 362 F. Supp. 3d 208, 224 (D. Del. 2019), *aff'd*, 801 F. App'x 48 (3d Cir. 2020).

## IV.  <u>ARGUMENT</u>

### A.    **Mr. Sun is Likely to Succeed on the Merits of his Claims.**

To meet the threshold requirement of reasonable likelihood of success on the merits, one "only needs to show that he has a reasonable probability of eventual success in the litigation, but not necessarily that he is more likely to succeed." *Zimmerman v. Int'l Longshoreman's Assoc. Local 1694*, 2024 WL 3104957 at *12 (D. Del. June 24, 2024) (citation omitted).

To prevail on a claim for promissory estoppel, Mr. Sun will need to show, "1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *CKSJB Holdings LLC v. EPAM Sys., Inc.*, 837 F. App'x 901, 905 (3d Cir. 2020). Under Delaware law, a promissory estoppel claim is established where a defendant made a promise to maintain the confidentiality of information disclosed to the defendant, and the plaintiff chose to continue to engage with the defendant based on the promise of confidentiality. *Fanean v. Rite Aid Corp. of Delaware*, 984 A.2d 812, 821–23 (Del. Super. 2009). When information is provided to defendant only after plaintiff secures assurances of confidentiality, such evidence supports a finding that plaintiff reasonably relied on defendant's promise to their detriment. *Lord v. Peninsula United Methodist Homes, Inc.*, 2001 WL 392237, at *3 (Del. Super. Apr. 12, 2001).

Here, Mr. Sun has a strong likelihood of success on his promissory estoppel claim. In the conversations between Ms. Shen and Mr. Sun that predated his decision to participate in the Billionaires Index, Bloomberg made express promises that any information provided to Bloomberg would only be used to verify his personal assets. Sun Decl. ¶6. These promises were echoed in Bloomberg's repeated assurances of privacy and protection of Mr. Sun's information (Wang Decl. ¶¶11–13), and further

13

corroborated by Mr. Sun's review of the other Billionaires Index profiles (Sun Decl. ¶¶8–9). Bloomberg made this promise for the purpose of inducing Mr. Sun to provide the Confidential Information so Bloomberg could develop his Billionaire's Index profile. Without this promise, Mr. Sun would not have disclosed the Confidential Information, the exposure of which presents significant security and privacy risks to Mr. Sun. Sun Decl. ¶7. Because Mr. Sun can easily establish each element of the claim, Mr. Sun has a strong likelihood of succeeding on the merits.[5]

Mr. Sun also has a reasonable probability of succeeding on his claim for public disclosure of private facts: "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Spence v. Cherian*, 135 A.3d 1282, 1288 (Del. Super. 2016).

Although the Third Circuit has not yet addressed these elements as applied to the exposure of private financial information related to cryptocurrency, the Northern District of California has determined that a customer who purchased a Ledger SAS hardware wallet to protect his cryptocurrency assets stated a privacy injury under the

---

[5] Any First Amendment defense here would be a red herring, as "the First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law." *Cohen v. Cowles Media Co*., 501 U.S. 663, 672 (1991).

public disclosure of private facts elements after his identifying information was posted on the dark web, in conjunction with the fact that he owns a Ledger wallet. *Baton v. Ledger SAS*, 740 F. Supp. 3d 847 (N.D. Cal. 2024). The court explained: "it would be highly offensive to a reasonable person to have one's [personally identifiable information] in conjunction with one's confidential financial information (as indicated by [plaintiff's] ownership of the wallet and thus his ownership in crypto wealth) disclosed to the public at large." *Id.* at 875–76 (indicating that having "significant crypto-assets" "would make a victim a 'ready target[ ] for targeted phishing and extortion attacks'").

The Court further noted that "there is no reason why one's confidential financial information would be of concern to the public. This information is not of public record, it is otherwise confidential, and it was released in conjunction with [plaintiff's] full name, so his anonymity is not preserved." *Id.* Likewise, several federal courts have found that disclosure of private financial information such as social security numbers are not of legitimate public interest. *Florence v. Ord. Express, Inc*., 674 F. Supp. 3d 472, 480 (N.D. Ill. 2023) ( "social security numbers and driver's license numbers, of course, are not of legitimate public concern"); *Purdy v. Burlington N. & Santa Fe Ry*. *Co*., 2000 WL 34251818 at *4 (D. Minn. Mar. 28, 2000), *aff'd sub nom*. *Purdy v. Burlington N. Santa Fe Corp*., 21 F. App'x

518 (8th Cir. 2001) (finding defendant "has offered no explanation for how the public might have a legitimate concern in individual social security numbers")

Here, Bloomberg publicized Mr. Sun's Confidential Information to millions of online readers and threatens to further publicize it in an additional article. This publication would be highly offensive to a reasonable person because, as the *Baton* court explained, the knowledge of what cryptocurrency Mr. Sun owns makes him an increased target for hacking, phishing, social engineering, kidnapping, or bodily injury. Mr. Sun is at significantly greater risk than the plaintiff in *Baton* because Bloomberg disclosed the ***amounts*** of cryptocurrencies Mr. Sun owns, aiding bad actors in identifying wallets belonging to Mr. Sun.

Furthermore, the Cryptocurrency Breakdown is not of legitimate public interest. Cryptocurrency is designed to maintain confidentiality, and this information is not otherwise a matter of public record. The Cryptocurrency Breakdown is, like a social security number, a piece of private, personal information in which the public has no legitimate interest. Accordingly, Mr. Sun has a reasonable likelihood of success on his claim for public disclosure of private facts.

### B.    Mr. Sun Will Be Irreparably Harmed Absent an Injunction.

A TRO is appropriate here because the harm Mr. Sun will suffer if Bloomberg continues to publicize the Cryptocurrency Breakdown online cannot be remediated. The publication of an individual's private information constitutes irreparable harm.

*A.A. v. New Jersey*, 176 F. Supp. 2d 274, 307 (D.N.J. 2001) ("In the absence of an injunction preventing the unlimited public disclosure of Plaintiffs home addresses, Plaintiffs will undoubtedly suffer irreparable harm to their constitutionally-protected privacy interests."), *aff'd in part, remanded in part sub nom. A.A. ex rel. M.M. v. New Jersey*, 341 F.3d 206 (3d Cir. 2003); *GTE Sylvania Inc. v. Consumer Prod. Safety Comm'n*, 404 F. Supp. 352 (D. Del. 1975) (finding "disclosure [of allegedly confidential and misleading information] would irreparably harm the plaintiffs"). As discussed above, the publication of Mr. Sun's Cryptocurrency Breakdown puts Mr. Sun at imminent risk of theft, hacking, kidnapping, and bodily harm. *See* Koutsky Decl. ¶¶9–16. The longer the Cryptocurrency Breakdown remains publicized, the greater its dissemination across the internet. And, while the Cryptocurrency Breakdown is publicly available in the Billionaire Index, it is paywalled. The threatened publication of an additional article featuring the Cryptocurrency Breakdown poses an even greater risk to Mr. Sun, because it will be accessible to all individuals with internet access.

Moreover, the publication of false information regarding Mr. Sun's TRX holdings poses a serious threat to his reputation, business relationships, and ongoing commercial endeavors. *See* Wang Decl. ¶¶22–24. The assertion that Mr. Sun holds the majority of TRX essentially claims that Mr. Sun controls the voting of TRX and, therefore, can choose representatives who govern the network. *Id.* ¶23. This

assertion directly contradicts the foundational principle of decentralization that is core to the TRON blockchain. *Id.* Indeed, misrepresenting the governance of the TRON blockchain as being centralized could—and if widely believed, would—cause material and unwarranted harm to the goodwill and reputation of TRON and to its ecosystem participants. *Id.* ¶24. Accordingly, this factor strongly supports the issuance of the TRO.

### C.    Granting Relief Will Not Result in Greater Harm to the Nonmoving Party.

Under the third factor for a preliminary injunction, a court must "balance the parties' relative harms; that is, the potential injury to the [movant] without this injunction versus the potential injury to the [non-movant] with it in place." *SEC v. Chappell*, 107 F.4th 114, 118 (3d Cir. 2024) (citation and quotation omitted). This balance of equities favors Mr. Sun.

Defendants will suffer no injury if they are required to retract and prohibited from republishing the quantities of specific cryptocurrencies Mr. Sun owns.

The First Amendment does not enable the press to disregard their legal and contractual obligations. That is, "the First Amendment does not provide a right to disregard promises that would otherwise be enforced under state law." *Barlow v. Serv. Emps. Int'l Union Loc. 668*, 90 F.4th 607, 616 (3d Cir. 2024). "Court enforcement of a private agreement to limit a party's ability to speak or associate" does not "violate the First Amendment" unless the court "imposes limitations on …

18

First Amendment rights beyond those … voluntarily waived." *Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d 192, 205, 206 (3d Cir. 2012). This principle applies no differently to promissory estoppel claims than to traditional breach of contract. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 664 (1991) (holding that First Amendment did not prohibit a journalist's source from claim against newspaper publisher for breaching of promise of confidentiality in exchange for the information). Nor does the First Amendment empower the press to make conscious decisions to recklessly disregard the substantial and unjustifiable risks endangering the safety of others.

Here, Bloomberg made explicit promises of confidentiality to Mr. Sun to induce him to disclose his Confidential Information—information he would not have shared absent those assurances. Bloomberg's status as a news organization does not exempt it from accountability under established contract and promissory estoppel doctrines. Allowing Bloomberg to evade its legal obligations simply because it is a media entity would undermine the very principles of equitable enforcement. Mr. Sun faces substantial and irreparable harm if Bloomberg is permitted to breach its promises without consequence. It is Mr. Sun's harm—not Bloomberg's likely invocation of the First Amendment—that should be the primary focus of the Court's TRO analysis. On the other side of the ledger, this TRO would not restrict Bloomberg from any speech "beyond" the speech that Bloomberg itself agreed to be

restricted from publishing its negotiations with Mr. Sun. *Democratic Nat. Comm.*, 673 F.3d at 206.

The freedom of press is a shield, not a sword—that is, the freedom of press protects honest mistakes and vigorous debate, not knowing falsehoods or reckless disregard for truth and safety. *Garrison v. State of La.,* 379 U.S. 64, 75 (1964). Disseminating false or dangerously misleading information is not constitutionally insulated either. *United States v. Gonzalez*, 905 F.3d 165, 192 (3d Cir. 2018) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)). "[T]here is no constitutional value in false statements of fact." *Gertz*, 418 U.S. at 340. As outlined above, Bloomberg's reckless publication of false and misleading information regarding Mr. Sun's holdings threatens to cause irreparable harm—not only to Mr. Sun and his business ventures, but also to the broader Tron Network. The scope of potential damage is wide-reaching, affecting individual safety, market stability, and investor confidence across the ecosystem. Meanwhile, Bloomberg would exclusively be (e)stopped from statements it already promised not to make—nothing else.

Accordingly, the balance of the equities weighs in favor of Mr. Sun.

### D.    An Injunction Will Serve the Public Interest.

Freedom of the press is not absolute and protecting false and harmful speech does not serve the public interest; quite the opposite. In *Gertz,* the Supreme Court explained "[t]he need to avoid self-censorship by the news media is [] not the only

20

societal value at issue . . . If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity." 418 U.S. at 341. Instead, the Court balanced the press's interest against "the individual's right to the protection of his own good name." *Id.* (citing *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring)).

The public interest is served by entering Mr. Sun's requested equitable relief. District courts in the Third Circuit have recognized that "[t]he public has an interest in protecting the privacy rights of its citizens." *Wolfson v. Lewis*, 924 F. Supp. 1413, 1435 (E.D. Pa. 1996); *Does v. City of Trenton Dep't of Pub. Works,* 565 F. Supp. 2d 560, 571 (D.N.J. 2008) (finding privacy interests outweighed "weak public interest in the disclosure of [individual's names and addresses]"). Moreover, "the public has a strong interest in seeing that contract … rights are respected." *Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc*., 138 F. App'x 431, 434–35 (3d Cir. 2005).

Here, the public has an interest in ensuring journalists keep their promises to their sources, to encourage the free exchange of information. Tellingly, to the extent Bloomberg claims a different understanding of the promise of protecting Mr. Sun's detailed information, Bloomberg was aware no later than March 27, 2025, that Mr. Sun relied on this level of protection in sharing his information. Sun Decl. ¶11; Wang Decl. ¶14. Yet Bloomberg waited *four months*—until the eve of publication—to register any disagreement with Mr. Sun's understanding, forcing Mr. Sun into this

emergency posture with the Court. Injustice can be avoided only by enforcing the promise. The public is best served by protecting public safety and order.

Accordingly, this factor weighs in favor of the requested TRO.

## V.    **CONCLUSION**

For the foregoing reasons, Mr. Sun respectfully requests that the Court grant Mr. Sun's TRO and enter an order requiring Bloomberg to remove the amounts of any specific cryptocurrency owned by Mr. Sun from any of its online publications, prohibiting Bloomberg from publishing the amounts of any specific cryptocurrency owned by Mr. Sun in any future publication, and requiring Bloomberg to retract its claim that Mr. Sun owns 60 billion Tronix and controls the majority of its supply.

Dated: September 11, 2025

BAKER & HOSTETLER LLP

*/s/ Jeffrey J. Lyons*
Jeffrey J. Lyons (#6437)
1201 North Market Street, Suite 1407
Wilmington, DE 19801
(302) 407-4222
jjlyons@bakerlaw.com

*Attorney for Plaintiff Yuchen Justin Sun*

22

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record hereby certifies that this brief contains

4,973 words, which complies with this Court's Standing Order.

<u>/s/ *Jeffrey J. Lyons*</u>
Jeffrey J. Lyons