IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUN, YUCHEN JUSTIN,<br><br>    Plaintiff,<br><br>  v.<br><br>BLOOMBERG L.P. and BLOOMBERG INC.,<br><br>    Defendants. | Civil Action No. 25-1007-CFC |

**DECLARATION OF DYLAN SLOAN
IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING
ORDER AND A PRELIMINARY INJUNCTION**

I, Dylan Sloan, declare:

1. I am a journalist at Bloomberg News ("Bloomberg"). This declaration is based on my personal knowledge and documents kept by me in the ordinary course of my work for Bloomberg. If called as a witness, I could and would testify competently to these facts under oath.

2. I am a journalist on the wealth team at Bloomberg, based out of Bloomberg's headquarters in New York City, NY. I have worked at Bloomberg since October 2024.

3. Prior to joining Bloomberg, I previously worked at Forbes, NPR, and

1

Fortune.

4. One of my responsibilities at Bloomberg is developing the Bloomberg Billionaires Index. *See* https://www.bloomberg.com/billionaires/.

5. On or about February 26, 2025, Bloomberg cryptocurrency reporter Muyao Shen introduced representatives for Plaintiff Justin Sun, including his spokesperson Sprina Wang, to me, so that we could discuss creating a Bloomberg Billionaires Index profile for him.

6. On approximately February 27, 2025, Ms. Wang created a Telegram group chat to facilitate an information exchange whereby Mr. Sun's representatives could share information regarding his assets for our consideration and reporting. Participants on the group chat included me, Mr. Sun's colleague, Timothy Chung, and at times Mr. Sun himself.

7. On February 28, 2025, at approximately 2:04 AM EST, Mr. Chung asked for my email address, and stated that he would "share with [me] the documents once get the approval from Justin."

8. On February 28, 2025, at approximately 5:55 AM EST, Mr. Chung sent a spreadsheet to me containing a detailed estimate of Mr. Sun's net worth. That spreadsheet included detailed financial information including cryptocurrency wallet addresses.

9. Here is a screenshot of the 2:04 AM Telegram chat where Mr. Chung

2

confirmed that he would share the document once he received approval from Mr. Sun, followed by his message at 5:55 AM confirming that he had done so (i.e., "shared").



10. Up until this point (and including it), I never offered or promised confidentiality in connection with the information Mr. Sun and his team were sharing with Bloomberg for the Bloomberg Billionaires Index.

11. Indeed, all of my communications with Mr. Sun and his team prior to this point were in writing on Telegram and via email. These written communications show that there was no prior agreement (or even discussion) as to confidentiality.

12. Nearly two hours later, at 7:51 AM, Mr. Chung sent a Telegram message and asked "Are there any Security & Privacy policies to prevent data leakage in your/BBG side? If have, Pls let's know the details."

13. I responded at 9:39 AM "Sure. Anytime I'll be accessing the data, it'll be within the Bloomberg office, which is a secure network."

14. Mr. Chung responded at 9:54 AM "Got. [sic] We also hope that only trust & limited people have access right for the documents, which can maximize the protection of our data."

15. I responded at 10:00 AM "Yes, definitely."

16. On their face, the messages do not pertain to our ability to report on the information contained within these documents, as Bloomberg deemed appropriate in its editorial judgment. We understood that this exchange concerned data security, meaning: our plans to ensure that we used appropriate data security measures in storing, viewing, and accessing the documents that were shared with us.

17. In addition, the fact that Mr. Chung posed his inquiry about "Security & Privacy policies" as a question only after sharing the documents demonstrates that there was no prior discussion, let alone agreement, even as to data security at that

time.

18.     On March 27, 2025, and nearly a month after he had provided the spreadsheet, Mr. Sun then sent a lengthy message via Telegram that for the first time raised the issue of confidentiality.  Here is a screenshot of that message.



19.     I have reviewed the Complaint and Amended Complaint in the above-captioned matter and am generally familiar with the allegations contained therein.

20.     I am aware that in the Amended Complaint, Mr. Sun has alleged that these messages "referred to the parties' prior agreement regarding the limited use of, and the protection of, Plaintiff's Confidential Financial Information."  Am. Compl. ¶ 27.

21.     This allegation is false.  As described above, there was no agreement made prior to receiving Mr. Sun's confidential information, or at any time thereafter,

5

regarding what Bloomberg could publish.

22. I am aware that Mr. Sun has also alleged that "Bloomberg did not object to Plaintiff's March 27, 2025, assertion of confidentiality or otherwise reject Plaintiff's understanding of the parties' agreement as to the use and protection of Plaintiff's Confidential Financial Information." Am. Compl. ¶ 28.

23. This allegation also is false.

24. In fact, after receiving this message, the Bloomberg team contacted Mr. Sun's spokesperson, Yeweon Park, to arrange a meeting in which we expressly told her that Bloomberg rejected Mr. Sun's unilateral terms.

25. On April 14, 2025, Tom Maloney and I met with Ms. Park via Zoom. During that meeting, Ms. Park asked us if we would agree to Mr. Sun's terms. We told Ms. Park that Bloomberg did not accept Mr. Sun's terms. We advised her that while they could choose to stop cooperating with us, we would continue our reporting as we deemed appropriate, based upon the information they had already provided.

26. Mr. Maloney and I kept contemporaneous notes of this meeting. My notes reflect that we told Ms. Park that we rejected Mr. Sun's unilateral terms.

27. Specifically, my notes reflect that Ms. Park asked if we could agree to Mr. Sun's terms, and that Mr. Maloney "said no."

6

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATE: September 18, 2025

_____
Dylan Sloan

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 19, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jeffrey J. Lyons
BAKER & HOSTETLER LLP
1201 N. Market Street, Suite 1407
Wilmington, DE 19801
jjlyons@bakerlaw.com

Isabelle Corbett Sterling
BAKER & HOSTETLER LLP
Transamerica Pyramid Center
600 Montgomery Street, Suite 3100
San Francisco, CA 94111
isterling@bakerlaw.com

Teresa Goody Guillen
Katherine L. McKnight
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 100
Washington, D.C. 20036
tgoodyguillen@bakerlaw.com
kmcknight@bakerlaw.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ James M. Yoch, Jr.*
James M. Yoch, Jr. (No. 5251)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
jyoch@ycst.com
rvrana@ycst.com

*Attorneys for Defendants*