IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUN, YUCHEN JUSTIN,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>BLOOMBERG L.P. and BLOOMBERG INC.,<br><br>　　　　　　Defendants. | Civil Action No. 25-1007-CFC |

### DECLARATION OF TOM MALONEY
### IN SUPPORT OF DEFENDANTS' OPPOSITION TO
### PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING
### ORDER AND A PRELIMINARY INJUNCTION

I, Tom Maloney, declare:

1. I am an editor at Bloomberg News ("Bloomberg"). This declaration is based on my personal knowledge and documents kept by me in the ordinary course of my work for Bloomberg. If called as a witness, I could and would testify competently to these facts under oath.

2. I am a wealth editor at Bloomberg, based out of Bloomberg's headquarters in New York City, NY. I have worked at Bloomberg since November 2018.

3. Prior to joining Bloomberg, I worked in Structured Finance at UBS

1

Investment Bank.

4. One of my responsibilities at Bloomberg is developing the Bloomberg Billionaires Index.

5. The Bloomberg Billionaires Index is a daily ranking of the world's 500 richest people based on their net worth. *See* https://www.bloomberg.com/billionaires/. Each subject's profile includes information about the billionaire, and asset valuations of that individual's fortune. The valuations are updated each trading day. We offer this important and newsworthy resource so that Bloomberg readers, and the public more generally, can evaluate, compare and better understand the fortunes of people who are among the wealthiest and most influential in the world.

6. On or about February 26, 2025, Bloomberg cryptocurrency reporter Muyao Shen introduced representatives for Plaintiff Justin Sun, including his spokesperson Sprina Wang, to my colleague on the Bloomberg wealth team, Dylan Sloan, so that we could discuss creating a profile for Mr. Sun in the Bloomberg Billionaires Index.

7. Shortly thereafter, on approximately February 27, 2025, Ms. Wang created a Telegram group chat to facilitate an information exchange whereby Mr. Sun's representatives could share information regarding his assets for our consideration and reporting. Participants on the group chat included Mr. Sloan, Mr.

Sun's colleague, Timothy Chung, Technical Lead at Tron Dao, and at times Mr. Sun himself. I was added to the Telegram chat on March 19. Prior to that date, Mr. Sloan shared the messages with me.

8.  On February 28, 2025, at approximately 2:04 AM EST, Mr. Chung asked for Mr. Sloan's email address, and stated that he would provide Mr. Sloan the documents after he was able to "get the approval from Justin."

9.  On February 28, 2025, at approximately 5:55 AM EST, Mr. Chung sent a spreadsheet to Mr. Sloan containing a detailed estimate of Mr. Sun's net worth. That spreadsheet included detailed financial information including cryptocurrency wallet addresses.

10. Here is a screenshot of the Telegram chat where Mr. Chung confirmed at 2:04 AM that he would share the document once he received approval from Mr. Sun, and at 5:55 AM that he had "shared" it.



11.     Up until this point (and including it), neither I nor Mr. Sloan had ever offered or promised confidentiality in connection with the information Mr. Sun and his team were sharing with Bloomberg for the Bloomberg Billionaires Index. To be clear, we never made such an offer or promise at any time, nor was the concept raised to us before Mr. Chung shared the information.

12.     Indeed, all of Mr. Sloan and my communications with Mr. Sun and his

4

team prior to this point were in writing on Telegram and via email. These written communications show that there was no prior agreement (or even discussion) as to confidentiality.

13. Nearly two hours later, at 7:51 AM, Mr. Chung sent a Telegram message and asked "Are there any Security & Privacy policies to prevent data leakage in your/BBG side? If have, Pls let's know the details."

14. Mr. Sloan responded at 9:39 AM "Sure. Anytime I'll be accessing the data, it'll be within the Bloomberg office, which is a secure network."

15. Mr. Chung responded at 9:54 AM "Got. [sic] We also hope that only trust & limited people have access right for the documents, which can maximize the protection of our data."

16. Mr. Sloan responded at 10:00 AM "Yes, definitely."

17. On their face, the messages do not pertain to our ability to report on the information contained within these documents, as Bloomberg deemed appropriate in its editorial judgment. We understood that this exchange concerned data security, meaning: our plans to ensure that we used appropriate data security measures in storing, viewing, and accessing the documents that were shared with us.

18. In addition, the fact that Mr. Chung posed his inquiry about "Security & Privacy policies" as a question only after sharing the documents demonstrates that there was no prior discussion, let alone agreement, even as to data security at that

time.

19. On March 4, 2025, Mr. Sloan contacted Mr. Sun and his team via Telegram to give more details about our plans regarding "data security" in connection with Mr. Sun's wallet addresses, and who would have access to the actual cryptocurrency wallet addresses to support our analysis of his wealth. Here is a screenshot of that message.

> Also--just wanted to double check that our plan for analyzing Justin's historical transactions is OK. Arkham Intelligence built a custom API for Bloomberg which allows us to compile data on token transfers and conversions to fiat for the wallet addresses you provided. That API is located on our internal network, meaning the file of Justin's wallet addresses won't leave our office and the only people who have access are my team and the engineers who manage the API (Arkham won't have access). Are you all OK with that plan as it relates to data security?
> 
> 09:30 AM

20. On March 8, Mr. Sun responded and approved the plan.

21. Again, this exchange pertained to data security. It did not limit Bloomberg's right to report on Mr. Sun in the Bloomberg Billionaires Index within its editorial discretion. (To be clear, Bloomberg has not published, and never intended to publish, Mr. Sun's cryptocurrency wallet addresses.)

22. Over the coming weeks, Mr. Sloan and I worked to analyze the information shared by Mr. Sun's team to prepare our Bloomberg Billionaires Index profile.

23. On March 25, 2025, Mr. Sloan and I contacted Mr. Chung to ask several

follow-up questions regarding Mr. Sun's TRX holdings.

24. Specifically, at 2:58 PM I asked Mr. Chung: "We wanted to check Justin's holding of Tron tokens. It seems to be the bulk of the outstanding coins, and more than he's been credited with in news reports. Is this something we could discuss to get some context on?"

25. Mr. Chung responded at 11:51 PM: "do you mean TRX? The total supply of TRX ~95b."

26. On March 26, 2025, at 7:07 AM, Mr. Sloan responded: "Yes, we're referring to TRX." He continued "looking to the spreadsheet it appears Justin's wallets hold around 70 billion TRX tokens—is that correct?

27. Mr. Chung then sent us a screenshot from the spreadsheet he had provided, highlighting Mr. Sun's TRX total from a summary page that compiled Mr. Sun's total wealth across various categories. Mr. Chung specifically highlighted the cell showing that Mr. Sun's specific number of TRX holdings was approximately 60.15 billion.

28. At 7:39 AM, I asked him: "So 60.15 bn of 95 bn total supply?" Mr. Chung confirmed "yes."

29. Here is a screenshot of this portion of the exchange in which Mr. Chung

confirmed that Mr. Sun held 60.15 billion TRX.[1]



---

[1] The screenshot is redacted for purposes of my declaration only because Plaintiff has claimed in this lawsuit that specific details regarding his wealth are sensitive, and not because of any promise made to him in connection with our reporting.



30. I asked some additional questions. At 1:44 PM, I asked Mr. Chung: "Also do these wallets belong to sun personally or other entities linked to him?" On March 27, 2025, at 6:24 AM, Mr. Chung confirmed: "sun personally."

31. Here is a screenshot of this portion of the exchange in which Mr. Chung confirmed that Mr. Sun held 60.15 billion TRX "personally."





9

32.     Later on March 27, 2025, and nearly a month after he had provided the spreadsheet, Mr. Sun then sent a lengthy message via Telegram that for the first time raised the issue of confidentiality.  Here is a screenshot of that message.



33.     I have reviewed the Complaint and Amended Complaint in the above-captioned matter and am generally familiar with the allegations contained therein.

34.     I am aware that in the Amended Complaint, Mr. Sun has alleged that these messages "referred to the parties' prior agreement regarding the limited use of, and the protection of, Plaintiff's Confidential Financial Information."  Am. Compl. ¶ 27.

35.     This allegation is false.  As described above, there was no agreement made prior to receiving Mr. Sun's confidential information, or at any time thereafter, regarding what Bloomberg could publish.

10

36. I am aware that Mr. Sun has also alleged that "Bloomberg did not object to Plaintiff's March 27, 2025, assertion of confidentiality or otherwise reject Plaintiff's understanding of the parties' agreement as to the use and protection of Plaintiff's Confidential Financial Information." Am. Compl. ¶ 28.

37. This allegation also is false.

38. In fact, after receiving this message, the Bloomberg team contacted Mr. Sun's spokesperson, Yeweon Park, to arrange a meeting in which we expressly told her that Bloomberg rejected Mr. Sun's unilateral terms.

39. On April 14, 2025, Mr. Sloan and I met with Ms. Park via Zoom. During that meeting, Ms. Park asked us if we would agree to Mr. Sun's terms. We told Ms. Park that Bloomberg did not accept Mr. Sun's terms. We advised her that while they could choose to stop cooperating with us, we would continue our reporting as we deemed appropriate, based upon the information they had already provided.

40. Both Mr. Sloan and I kept contemporaneous notes of this meeting which reflect that we told Ms. Park that we rejected Mr. Sun's unilateral terms.

41. Specifically, my notes reflect that we told Ms. Park we "did not agree to Justin's terms" and that "I said we would publish details of holdings to substantiate our valuation and that we didn't agree to any terms."

42. On May 19, 2025, I wrote a note to Mr. Sun and others to confirm our

11

valuation and reporting, which specifically addressed Bloomberg's proposed valuation amount. Here is a screenshot of that exchange:



43. Mr. Sun did not dispute our reporting that his TRX stake was worth approximately $4 billion, after a 75% liquidity discount. Nor did Mr. Sun contest our reporting that "JS [Justin Sun] owns majority of supply" of TRX.

44. Mr. Sun did respond to a separate point, asking that we adjust his stake for a different asset, HTX, to 90%, which we did.

45. I am aware that Mr. Sun has alleged that "Without Bloomberg's confidentiality assurances, Plaintiff would not have agreed to participate in

Bloomberg's Billionaires Index." Compl. ¶ 30.

46. However, as explained above, the written record demonstrates that Mr. Sun and his team shared his cryptocurrency information with us without any agreement for confidentiality. In addition, to the best of my knowledge, no one from the Bloomberg's Billionaires Index team (including me) ever promised Mr. Sun confidentiality in connection with the Bloomberg's Billionaires Index profile. To the contrary, we expressly told his publicist that we did not accept his confidentiality terms.

47. The Bloomberg Billionaires Index profile for Mr. Sun was published on the Bloomberg website on August 11, 2025 at approximately 5:12 PM ET.

48. Later that same day, Mr. Sun filed this lawsuit against Bloomberg.

49. Shortly after filing his lawsuit, Mr. Sun's representatives contacted Bloomberg to request a correction. In response to his request, Bloomberg made a few minor changes to the profile.

50. First, Mr. Sun's representatives noted that the Net Worth Summary of the index profile incorrectly reported that he had "700,000 Tether" instead of "700 million Tether." Once this was brought to our attention, we corrected it, and matched the amount of Mr. Sun's holdings of Tether cryptocurrency in the Net Worth Summary with the figure used in the Index valuation.

51. I understand that Mr. Sun has alleged that Bloomberg put him at risk

13

"by disclosing specific amounts of [his] cryptocurrency holdings."  Am. Compl. ¶ 45.  But even though he alleges accurate information risked harming him, Mr. Sun and his representatives actually asked Bloomberg to make its reporting as to his Tether holdings more accurate.

52. We also made two other minor corrections: we included the proper year of Mr. Sun's HTX purchase in the Overview section, and we clarified the timeline for some entries in his biography.  We made all three changes in good faith because we want to ensure the profile is accurate.

53. However, there was one change Mr. Sun requested that we did not make, because we did not believe it was credible.  Specifically, Mr. Sun's representatives asked us to lower his reported TRX holdings from approximately 60 billion TRX to only 8 billion TRX.  We explained that we were unable to do so unless Mr. Sun could credibly support his assertion, particularly given that, as described above, Mr. Sun's representative had in February provided us with a spreadsheet with detailed wallet information reflecting that he owned 60 billion TRX and had specifically confirmed the information after our follow-up questioning.  We asked Mr. Sun to clarify within the same spreadsheet which wallets he claims he owns, and which he disclaims.  He refused.

54. Mr. Sun did provide us with a third-party report to purportedly support his correction request, but in our editorial judgment it was unpersuasive and did not

14

substantiate a change in the index profile for multiple reasons. It was apparent from the face of the report that Mr. Sun had not provided the author with the same wallet information he had given us. In addition, Mr. Sun declined to answer several questions we asked regarding the report.

55.  Thus, he failed to provide us with sufficiently credible or direct responses to support the correction he had requested. In addition, we believe Mr. Sun may not want the public to know that he controls a majority of the TRX in circulation and therefore wants Bloomberg to now understate his TRX holdings, despite the credible information he previously provided and on which our profile was based. In our editorial judgment, we continue to believe that the 60 billion TRX number, originally supplied and confirmed by Mr. Sun's representative, is correct.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATE: September 18, 2025

_____
Tom Maloney

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 19, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jeffrey J. Lyons
BAKER & HOSTETLER LLP
1201 N. Market Street, Suite 1407
Wilmington, DE 19801
jjlyons@bakerlaw.com

Isabelle Corbett Sterling
BAKER & HOSTETLER LLP
Transamerica Pyramid Center
600 Montgomery Street, Suite 3100
San Francisco, CA 94111
isterling@bakerlaw.com

Teresa Goody Guillen
Katherine L. McKnight
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 100
Washington, D.C. 20036
tgoodyguillen@bakerlaw.com
kmcknight@bakerlaw.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ James M. Yoch, Jr.*
James M. Yoch, Jr. (No. 5251)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
jyoch@ycst.com
rvrana@ycst.com

*Attorneys for Defendants*